# UNITED STATES *v.* SCOPHONY CORPORATION OF AMERICA ET AL.

No. 41.   Argued January 12–13, 1948.—Decided April 26, 1948.

*Sigmund Timberg* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Sonnett, Charles H. Weston* and *Robert L. Stern.*

*Edwin Foster Blair* argued the cause and filed a brief for Scophony, Ltd., appellee.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

The appellee Scophony, Limited is a British corporation which has its offices and principal place of business in London, England. The question is whether that company "transacted business" and was "found" within the Southern District of New York under § 12 of the Clayton Act,[1] so that it could be sued and served there in a civil proceeding charging violation of §§ 1 and 2 of the Sherman Act. 26 Stat. 209, 50 Stat. 693, 15 U. S. C. §§ 1, 2. The violations stated were that Scophony and the other defendants [2] had monopolized, attempted to monopolize, and conspired to restrain and monopolize interstate and

---

[1] "SEC. 12. That any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." 38 Stat. 736, 15 U. S. C. § 22.

[2] The suit was instituted against Scophony, Limited (designated in this opinion as "Scophony"), Scophony Corporation of America (designated "American Scophony"), General Precision Equipment Corporation (designated "General Precision"), Television Produc-

foreign commerce in products, patents and inventions useful in television and allied industries. The cause is here on direct appeal[3] from an order of the District Court granting Scophony's motion to quash the service of process and dismiss the complaint as to it. 69 F. Supp. 666.

Scophony manufactures and sells television apparatus and is the owner and licensor of inventions and patents covering television reception and transmission.[4] With the outbreak of the European War in 1939, the British Broadcasting Corporation stopped television broadcasting. Consequently it became impossible for Scophony to continue in the commercial development, manufacture and sale of television equipment in England. It therefore sent personnel to the United States, opened an office in New York City, and began demonstrations of its product and other activities preliminary to establishing a manufacturing and selling business in this country.

Late in 1941 Scophony found itself in financial distress, in part because of restrictions imposed by the British Government on the export of currency. It became imperative that new capital from American sources be found for the enterprise. Accordingly, Arthur Levey, a director

tions, Inc. (designated "Productions"), Paramount Pictures, Inc. (designated "Paramount"), and three individual defendants, Arthur Levey and the presidents of General Precision and Productions. The corporations, except Scophony, are incorporated in the United States.

[3] Pursuant to § 2 of the Expediting Act of February 11, 1903, 32 Stat. 823, 15 U. S. C. § 29, and § 238 of the Judicial Code, 43 Stat. 938, 28 U. S. C. § 345.

[4] The inventions and patents in the main relate to two systems of television transmission and reception, one known as the "supersonic" system and the other as the "skiatron" system. We shall at times refer to the present and future patents, processes, designs, technical data, etc., relating to these two systems as the Scophony inventions.

A third system, the cathode-fluorescent system, was developed early in this century and is the principal method of television transmission and reception used in the United States today.

of Scophony and one of its founders, undertook negotiations in New York with American motion picture and television interests, including Paramount and General Precision. They culminated in the execution of three interlacing contracts, the so-called master agreement of July 31, 1942, and two supplemental agreements of August 11, 1942. Copies of the latter had been attached to the master agreement, which provided for their later execution, and they when executed in effect carried out its terms. The alleged violations of the Sherman Act center around these agreements.

The master agreement was executed by Scophony, William George Elcock, as mortgagee of all of Scophony's assets, General Precision, and Productions, the latter a wholly owned subsidiary of Paramount. It provided for the formation of a new Delaware corporation, American Scophony, with an authorized capital stock of 1,000 Class "A" shares and a like number of Class "B" shares. Scophony and individuals interested in it [5] were to be given the Class "A" shares. Under the agreement, ownership of those shares conferred the right to elect three of American Scophony's five directors and its president, vice president and treasurer. The Class "B" shares were allotted to General Precision and Productions. By virtue of such ownership those two corporations were entitled to name the remaining two directors and the secretary and assistant secretary of American Scophony. Levey was named in the agreement as the president and a director of the new corporation.

The master agreement set forth the general desire of the parties to promote the utilization of the Scophony inventions "particularly in the United States of America

---

[5] An agreement of February 4, 1943, amended the original agreement so as to give two-thirds of the "A" shares to Scophony, the remainder to individuals.

and generally in the Western Hemisphere." It then stated that American Scophony had been organized "as a means therefor." Scophony agreed to transfer all its television equipment then in the United States to American Scophony and to enter into the first supplemental agreement. Scophony, with the other parties, also undertook to cause American Scophony to enter into both supplemental agreements. For the "B" stock in American Scophony and other rights acquired, General Precision and Productions agreed to enter into the second supplemental agreement and to pay specified sums in cash to Scophony or for its benefit in liquidation of listed obligations.

Pursuant to the master agreement's terms, the first supplemental agreement was executed by Scophony, Elcock, as mortgagee of its assets, and American Scophony; the other, by American Scophony, General Precision, and Productions. For present purposes it is necessary to set forth only the general effect of the agreements taken together. Scophony transferred to American Scophony not only all of its equipment in the United States, but also all patents and other interests in the Scophony inventions within the Western Hemisphere. General Precision and Productions were granted exclusive licenses under American Scophony's patents. They agreed to pay royalties on the products produced under the licenses and American Scophony undertook to transmit fifty per cent of such royalties to Scophony. American Scophony gave Scophony an exclusive sublicense for the Eastern Hemisphere on a royalty basis under all patents licensed to American Scophony by General Precision and Productions. Provision was also made for the interchange of technical data and information respecting the Scophony inventions. Finally, it was agreed that Scophony would not market any product involving the Scophony inven-

tions in the Western Hemisphere and that General Precision and Productions would not export any such product to the Eastern Hemisphere.[6]

This rather complex plan soon fell of its own weight. Starting in 1943, an impasse developed in the affairs of American Scophony. It stemmed from the failure and unwillingness of General Precision and Productions to exploit the Scophony inventions themselves and their refusal to modify the agreements to permit the licensing of other American firms under the inventions. Several manufacturers expressed an interest in obtaining licenses. But in each instance the directors representing the American interests holding the Class "B" shares were unwilling to approve the necessary modifications in the existing arrangements. In July, 1945, the directors representing the "B" interests resigned. This made it impossible for American Scophony to transact business, since charter and by-law provisions adopted pursuant to the master and supplemental agreements required the presence of at least one Class "B" director for a quorum. Adding to the difficulties were American Scophony's shortage of funds and the apparent reluctance of the American interests to cooperate in efforts to place American Scophony on firmer financial footing. American Scophony's affairs were further complicated by the institution of the present antitrust proceeding on December 18, 1945.

Levey kept Scophony advised of developments in the dispute between the "A" and "B" factions and otherwise

---

[6] The complaint alleged that the effects of the agreements and understandings were to create a territorial division of the manufacture and sale of television products, assigning the Eastern Hemisphere to Scophony and the Western Hemisphere to General Precision and Productions; to suppress and restrain competition in the manufacture and sale of television equipment, both in the domestic and in the export markets; and to give General Precision and Productions monopoly power over the Scophony inventions which enabled them to suppress their exploitation and deprive others of their use.

made progress reports to Scophony on its interests in the United States. As the impasse heightened, other individuals were authorized by Scophony to act in its behalf in the United States.[7] Service of process as to Scophony was made first on Levey in New York City on December 20, 1945.[8]

On April 5, 1946, a summons and a copy of the complaint directed to Scophony were also served on Elcock in New York City. He was a dominant figure in Scophony. He arrived in this country in March, 1946, with the mission of investigating and ending the impasse and disposing of Scophony's interest in American Scophony. Elcock not only was mortgagee of Scophony's assets by virtue of having made a large loan to the company. He was also its financial comptroller and a member of its board. At the time of service on him, he held a comprehensive power of attorney, irrevocable until March, 1947, giving him complete power to act with regard to Scophony's interests in the United States, including those in American Scophony.[9]

The District Court, in granting the motion to quash service and dismiss the complaint as to Scophony, held

---

[7] These included at various times two American attorneys, a member of the British Parliament, and an English officer.

[8] Levey immediately informed Scophony in England of this action and advised it to designate appropriate counsel. On December 21, 1945, he sent a copy of the complaint to Scophony by airmail.

[9] The power of attorney set forth Scophony's desire to appoint Elcock to act "and bind the Company in all or any matters affecting the Company's interests in the United States . . . ." It then authorized Elcock to institute and prosecute all proceedings necessary to conserve Scophony's interests; to defend or compromise any suits brought against Scophony; to settle accounts; to engage or dismiss subagents; to borrow money; to dispose of any and all of Scophony's property and interests in the United States; and "generally to represent the Company in the United States of America in all matters in any way affecting or pertaining to the Company . . . ."

that it was not "found" in the Southern District of New York within the meaning of § 12. The court rejected the contention that Scophony was within the jurisdiction by reason of the activities of its agents. It concluded that none of those activities related to Scophony's ordinary business of manufacturing, selling and licensing television apparatus, but all were confined to protecting Scophony's interest in American Scophony. It also found that the conduct of American Scophony did not serve to bring Scophony within the jurisdiction. 69 F. Supp. 666.

## I.

Section 12 of the Clayton Act has two functions, first, to fix the venue for antitrust suits against corporations; second, to determine where process in such suits may be served. Venue may be had "not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found *or transacts business.*" And all process may be served "in the district of which it is an inhabitant, or wherever it may be found." (Emphasis added.)

A plain and literal reading of the section's words gives it deceptively simple appearance. The source of trouble lies in the use of verbs descriptive of the behavior of human beings to describe that of entities characterized by Chief Justice Marshall as "artificial . . . , invisible, intangible, and existing only in contemplation of law." *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 636.[10]

---

[10] More than once Marshall had difficulty in transferring to corporations or other institutions legal conceptions and relations shaped in nomenclature and in fact from normative evolution in relation to persons of flesh and blood.

See, *e. g., Bank* v. *Deveaux,* 5 Cranch 61, where he was unable to adapt the concept of corporate "inhabitancy," applied in decisions he cited, for fitting the corporation into the constitutional scheme of diversity jurisdiction. His individualistic solution brought difficulties

The process of translating group or institutional relations in terms of individual ones, and so keeping them distinct from the nongroup relations of the people whose group rights are thus integrated, is perennial, not only because the law's norm is so much the individual man, but also because the continuing evolution of institutions more and more compels fitting them into individualistically conceived legal patterns. Perhaps in no other field have the vagaries of this process been exemplified more or more often than in the determination of matters of jurisdiction, venue and liability to service of process in our federal system.[11] It has gone on from *Bank* v. *Deveaux*, 5 Cranch 61, and *Baptist Association* v. *Hart's Executors*, 4 Wheat. 1, to *International Shoe Co.* v. *Washington*, 326 U. S. 310, and now this case.[12]

The translation, or rather the necessity for it, permeates every significant word of § 12, not wholly excluding "or transacts business." If the statutory slate were clean, one might readily conclude that the words "inhabitant" and "found" would have the same meaning for locating both

which lasted for decades. See Henderson, The Position of Foreign Corporations in American Constitutional Law 50–76; Harris, A Corporation As a Citizen, 1 Va. L. Rev. 507. Cf. *Baptist Association* v. *Hart's Executors*, 4 Wheat. 1.

[11] See, *e. g.*, Cahill, Jurisdiction over Foreign Corporations and Individuals Who Carry on Business within the Territory, 30 Harv. L. Rev. 676; Scott, Jurisdiction over Nonresidents Doing Business within a State, 32 Harv. L. Rev. 871; Bullington, Jurisdiction over Foreign Corporations, 6 N. C. L. Rev. 147; Note, What Constitutes Doing Business by a Foreign Corporation for Purposes of Jurisdiction, 29 Col. L. Rev. 187.

[12] The very federalism of our structure magnifies the problem, by multiplying state and other governmental boundaries across which corporate activity runs with the greatest freedom. The problem arises on constitutional as well as statutory and common-law levels. Cf. *International Shoe Co.* v. *Washington*, 326 U. S. 310; *Puerto Rico* v. *Russell & Co.*, 288 U. S. 476.

venue and the proper place for serving process. But even so, each of those terms and indeed the term "transacts business" would have to be given specific content actually descriptive of corporate events taking place within specified areas. Because all corporate action must be vicarious, that content could be determined only by an act of judgment which selects and attributes to the corporation, from the mass of activity done or purporting to be done on its behalf, those acts of individuals which are relevant for the particular statutory purposes and policies in hand.

The statutory slate, however, is neither entirely new nor clean. Both legislative and judicial hands have written upon it. The writing is meandering, unclear in part, and partly erased. But it cannot be disregarded. What is legible must furnish guidance to decision. We deal here with a problem of statutory construction, not one of constitutional import.[13] Nor do we have any question of the exercise of Congress' power to its farthest limit. The issue is simply how far Congress meant to go, and specifically whether it intended to create venue and liability to service of process through the occurrence within a district of the kinds of acts done here on Scophony's behalf.

Section 12 of the Clayton Act is an enlargement of § 7 of the Sherman Anti-Trust Act. *Eastman Co.* v. *Southern Photo Co.*, 273 U. S. 359. The earlier statute

---

[13] Appellee makes no suggestion of a constitutional issue. The Government, however, suggests that, in view of our recent decision in *International Shoe Co.* v. *Washington*, 326 U. S. 310, which was concerned with the jurisdiction of a state over a foreign corporation for purposes of suit and service of process, and in view of aspects of similarity between that problem and the one now presented, we extend to this case and to § 12 the criteria there formulated and applied. There is no necessity for doing so. The facts of the two cases are considerably different and, as we have said, we are not concerned here with finding the utmost reach of Congress' power.

provided for suit in the district in which the defendant "resides or is found." 26 Stat. 210. That wording controlled for both venue and fixing the places for service of process.

We do not stop to review the decisions construing § 7 and similar statutes, cf. *Suttle* v. *Reich Bros.*, 333 U. S. 163; see *International Shoe Co.* v. *Washington, supra,* at 317–319, except to refer to *People's Tobacco Co.* v. *American Tobacco Co.*, 246 U. S. 79. There the foreign corporation was sued in a district in which it did not "reside." Because the Court found that the company had withdrawn from the state in which the district was located and had revoked the authority of its principal agents there, it held that the defendant was not "found" in the district, although certain corporate activities continued.

The conventional rationalization applied equated "found" in sequence to "presence," to "doing business by its agents there," to "of a character warranting inference of subjection to the local jurisdiction." [14] The facts that the company continued to advertise its goods in the state and district, to make interstate sales to jobbers there, to send in drummers who solicited retail orders to be turned over to the jobbers, and finally to own stock in local subsidiaries, were held not to constitute the sort of "doing business" warranting the inference of subjection to the local jurisdiction for the statute's purposes. *International Harvester Co.* v. *Kentucky,* 234 U. S. 579, was narrowly distinguished. 246 U. S. at 87.

[14] The Court said: "The general rule deducible from all our decisions is that the business must be of such nature and character as to warrant the inference that the corporation has subjected itself to the local jurisdiction, and is by its duly authorized officers or agents present within the State or district where service is attempted. *Philadelphia & Reading Ry. Co.* v. *McKibbin,* 243 U. S. 264; *St. Louis Southwestern Ry. Co.* v. *Alexander,* 227 U. S. 218, 226." 246 U. S. 79, 87.

The suit in the *People's Tobacco* case was begun in 1912, but the decision was not rendered until 1918. Meanwhile, in 1914, Congress had enacted the Clayton Act, including § 12. The following year the *Eastman* case, *supra,* was begun in the Northern District of Georgia. Process issued and was served under § 12 on the defendant, a New York corporation, at its principal place of business in Rochester. In 1927 this Court sustained both the venue and the service, as against objections that § 12 had not broadened § 7 of the Sherman Act, but merely made explicit what had been decided under it.[15]

The argument was certainly plausible, but for the fact that it made the addition of "or transacts business" to "inhabitant" and "found" in § 12 redundant and meaningless. The Court refused to accept the argument, because doing so would have defeated the plain remedial purpose of § 12.[16] That section was enacted, it held, to enlarge the jurisdiction given by § 7 of the Sherman Act

[15] Counsel for the defendant equated the words "inhabitant" and "found" of § 12 to "resides or is found" of § 7 of the Sherman Act. They then went on to argue that the addition of "or transacts business" in the venue clause of § 12 did not broaden the section, but merely made explicit what the Court had already decided under the earlier statute. 273 U. S. at 361. This, because "or transacts business" was said to be nothing more than "carrying on business," which was the content the Court had given to "is found" in § 7, by the *People's Tobacco* case and others.

[16] Rather, the Court said, the section supplements "the remedial provision of the Anti-Trust Act for the redress of injuries resulting from illegal restraints upon interstate trade, by relieving the injured person from the necessity of resorting for the redress of wrongs committed by a non-resident corporation, to a district, however distant, in which it resides or may be 'found'—often an insuperable obstacle—and enabling him to institute the suit in a district, frequently that of his own residence, in which the corporation *in fact* transacts business, and bring it before the court by the service of process in a district in which it resides or may be 'found.'" 273 U. S. 359, 373. (Emphasis added.)

over corporations by adding those words, "so as to establish the venue of such a suit not only, as theretofore, in a district in which the corporation resides or is 'found,' but also in any district in which it 'transacts business'—although neither residing nor 'found' therein—in which case the process may be issued to and served in a district in which the corporation either resides or is 'found.'" 273 U. S. at 372.[17]

This construction gave the words "transacts business" a much broader meaning for establishing venue than the concept of "carrying on business" denoted by "found" under the preexisting statute and decisions. The scope of the addition was indicated by the statement "that a corporation is engaged in transacting business in a district . . . if *in fact, in the ordinary and usual sense,* it 'transacts business' therein *of any substantial character.*" *Id.* at 373. (Emphasis added.)

In other words, for venue purposes, the Court sloughed off the highly technical distinctions theretofore glossed upon "found" for filling that term with particularized meaning, or emptying it, under the translation of "carrying on business." In their stead it substituted the practical and broader business conception of engaging in any substantial business operations. Cf. *Frene* v. *Louisville Cement Co.,* 77 U. S. App. D. C. 129, 134 F. 2d 511; *International Shoe Co.* v. *Washington, supra.* Refinements such as previously were made under the "mere solicitation" and "solicitation plus" criteria, cf. *Frene* v. *Louisville Cement Co., supra,* and like those drawn, *e. g.,* between the *People's Tobacco* and *International Harvester* cases, *supra,* were no longer determinative. The practical, everyday business or commercial concept of doing or carrying on business "of any substantial character" became the test of venue.

---

[17] See also note 16.

Applying it, the Court stated that "manifestly" the Eastman Company was not "present" in the Georgia district under the earlier tests of § 7 of the Sherman Act, either for the purpose of venue or as being amenable to service of process. P. 371. It thus aligned the case under those tests with the *People's Tobacco* decision rather than the *International Harvester* one. But, under the broader room given by § 12, venue was held to have been established.[18]

Thus, by substituting practical, business conceptions for the previous hair-splitting legal technicalities encrusted upon the "found"–"present"–"carrying-on-business" sequence, the Court yielded to and made effective Congress' remedial purpose. Thereby it relieved persons injured through corporate violations of the antitrust laws from the "often insuperable obstacle" of resorting to distant forums for redress of wrongs done in the places of their business or residence. A foreign corporation no longer could come to a district, perpetrate there the injuries outlawed, and then by retreating or even without retreating [19] to its headquarters defeat or delay the retribution due.

---

[18] The concrete facts held to sustain the venue were that the Eastman Company was engaged "not only in selling and shipping its goods to dealers within the Georgia district, but also in soliciting orders therein through its salesmen and promoting the demand for its goods through its demonstrators for the purpose of increasing its sales . . . ." 273 U. S. at 374.

The Court also expressly stated that, in contrast to prior limitations, the company was "none the less engaged in transacting business . . . because of the fact that such business may be entirely interstate in character and be transacted by agents who do not reside within the district," referring in this connection to *International Harvester Co.* v. *Kentucky*, 234 U. S. 579, 587, and *Davis* v. *Farmers Co-operative Co.*, 262 U. S. 312, 316. 273 U. S. 359, 373.

[19] *I. e.*, by artful arrangement of agents' authority, or of their comings and goings, or of the geography of minute incidents in contracting. Cf. *People's Tobacco Co.* v. *American Tobacco Co.*, 246

With venue established under the new and broader approach, the *Eastman* case presented no problem regarding the service of process, except possibly for the ruling that process might run to another district than the one in which suit was brought. 273 U. S. at 374. For by whatever test, whether of the old § 7 or the new § 12, the service was good. As we have noted, the process had been directed to and served in the district where the Eastman Company was an "inhabitant." [20] There was therefore no necessity for ruling upon the meaning of "found" as relating to any other district. Any such ruling necessarily could be no more than dictum, since no such issue was presented by the facts.

Nevertheless, for service of process § 12 had specified "the district of which it is an inhabitant, or wherever it may be found" without adding "or transacts business," as was done in the venue clause. Accordingly the Court took account of this difference and went on to indicate that for purposes of liability to service the section merely carried forward the preexisting law, so that in some situations service in a district would not be valid, even though venue were clearly established under § 12.[21]

---

U. S. 79. Such artifice saw its day end for creating substantive liability through a course of dealing contrary to the antitrust statutes, but without thereby also creating venue to enforce it, with the advent of § 12.

[20] As has been stated, the company was incorporated in New York and had its principal office and place of business in Rochester.

[21] Although difference of that sort may appear to be generally incongruous, since ordinarily it would seem that susceptibility to suit in a district should be accompanied by amenability to process there, such things of course are for Congress' determination as matters of policy relating to the scope and correlation, or lack of it, of venue and service provisions. There is certainly no constitutional requirement that the two be coextensive. And to support the dictum, if it were now necessary to rule on the matter, considerations beyond the verbal difference to which the *Eastman* opinion pointed might be stated.

But regardless of the pronouncement's effect, the decision, by resolving the venue problem, substantially removed the serious obstacles and practical immunities to suit which had grown up under § 7 of the Sherman Act, in by far the larger number of antitrust cases, *i. e.,* for those not involving companies incorporated outside the United States. In them the fact that service may be dubious in the district of suit and can be assured only by causing process to run to another district, as in the *Eastman* case, presents no such obstacle to bringing and maintaining the suit as existed prior to § 12. The necessity, if it is that, for directing process to another district, creates at most some slight inconvenience and additional expense.

## II.

In this case, however, we deal with a company incorporated outside the United States. But there can be no question of the existence of "jurisdiction," in the sense of venue under § 12, over Scophony in the Southern District of New York. To say that on the facts presented Scophony transacted no business "of any substantial character" there during the period covered by institution of the suit and the times of serving process would be to disregard the practical, nontechnical, business standard supplied by "or transacts business" in the venue provision. It would be also to ignore the fact that Scophony then and there was carrying on largely, if not exclusively, the only business in which it could engage at the time.

Scophony's operations in New York were a continuous course of business before and throughout the period in question here. They consisted in strenuous efforts not simply to save an American "investment," as is urged, but to salvage and resuscitate Scophony's whole enterprise from the disasters brought upon it by the war. As with

such efforts generally, changes in method and immediate objective took place as each one tried in turn failed to work out. But those changes brought none in ultimate objective, namely, to find a mode of saving and profitably exploiting the Scophony inventions; and none in the intensity or continuity with which that object was pursued in New York.

First was the phase of attempting to set up in this country as manufacturer and seller of television equipment. When that failed, the company turned to licensing and exploiting its patents by other means. This was done through the complicated arrangements for what practically if not also technically was a joint adventure with other companies. That project was carried out not merely through corporate forms and arrangements but by contracts binding the participating companies to the common enterprise, as well as the special medium of executing it, American Scophony. In this each corporate participant had its special functions, controls and restrictions created in part by share ownership in American Scophony, but also in important respects by contract both beyond the stock controls and dictating their character.[22] Finally, as the affairs of the keystone of the structure,

---

[22] *E. g.*, the hemispheric division of territories between the British and American interests; the exclusive licensing agreements which prevented Scophony from granting licenses to interested American companies; and the arrangements for the interchange of technical information were contractual, not charter limitations on corporate powers. The particular corporate medium used, American Scophony, and the refinements in its charter and by-laws giving General Precision and Productions an effective veto power over its operations were themselves aspects of the contractual undertakings embodied in the master agreement and the two supplemental agreements. The master agreement also designated the persons to become officers and directors of American Scophony, as representatives of both the British and the American interests.

American Scophony, came to and continued in stalemate, the immediate objective shifted once more, to getting out of the trap. Again the shift was in direct and constant pursuit of Scophony's primary and continuing object, to find a way to save and to exploit its patents.

This is a story of business in trouble, even desperate. We may have sympathy for the company's plight. But it does not follow that such continuing, intensive activities to save the business and put it on a normal course, even though shifting as they did in the successive winds that blew, did not constitute "transacting business" of "any substantial character." Nor can we say that any of the major shifts in tacking toward the ultimate end stopped or interrupted the course of the company's business activity. At no time was the drive toward achieving its basic objects suspended.

Appellee would avoid this view and its consequences by taking an entirely different conception of what took place. It emphasizes that Scophony's corporate objects, as stated in its charter, were to manufacture and sell television equipment. Hence it concludes that when all New York activity directly pointing to that end ceased, and was followed by the phase of seeking to exploit the patents through the arrangements centering around American Scophony, the British company ceased to be engaged in promoting its corporate objects and thus in carrying on or doing business in New York for the relevant statutory purposes. From then on, it is claimed, Scophony became concerned solely with creating and protecting an "investment," namely, in American Scophony's shares. Nor did Scophony resume the doing of business when that effort also failed and the final stage of seeking to break the impasse arrived, because manufacturing and sale of equipment were not revived.

To this view of the sequence of events appellee then seeks to apply this Court's decisions interpreting "found"

under § 7 and similar requirements in application to manufacturing and selling companies,[23] and also the like *Eastman* dictum concerning § 12. In doing this it seeks especially to invalidate the service by casting up from those decisions a check list of specific and often minor incidents of that sort of business done or not done as relevant to whether business is being carried on, and then matching against the list Scophony's New York activities as of the times of service.[24]

Obviously this view of the facts and of the determinative legal approach is at wide variance from the ones we have taken in dealing with the question of venue. But we do not find it necessary, in order to reject it for purposes of sustaining the service, to consider whether the process clause of § 12 should be given scope beyond that indicated by the *Eastman* dictum. For in any event we think that appellee and the District Court have misconceived the effects of the facts and of the decisions on which they rely, for determining the validity of the service in this case.

Certainly appellee's conclusionary premise cannot be accepted, that its sole authorized or actual business was manufacturing and selling equipment; or therefore the

---

[23] *E. g., Cannon Mfg. Co.* v. *Cudahy Co.,* 267 U. S. 333; *Consolidated Textile Corp.* v. *Gregory,* 289 U. S. 85; *People's Tobacco Co.* v. *American Tobacco Co.,* 246 U. S. 79.

[24] The catalogue emphasizes things not being done as of the dates of service, *e. g.,* maintaining an office, warehouse or place of business; owning realty or other physical property; keeping a staff of employees; having agents "other than counsel in this case and . . . Elcock"; keeping a telephone or a listing; making sales; conducting research; soliciting orders. Correspondingly appellee atomizes the things then being done into separate, disconnected events, *viz.,* stock ownership (in American Scophony); contracting with American Scophony and the other corporations for transfer and licensing of patents; activities to protect Scophony's American "interests" by resolving the impasse.

further one that no other activity on its behalf could constitute doing or engaging in business. Indeed it was authorized to take out, hold and exploit television patents, and doing this was certainly as much part of its business as manufacturing and selling the equipment they covered. There is nothing to show that Scophony was restricted by its charter or otherwise to exploiting its patents exclusively by direct manufacture and sale. When therefore, after that method had failed, the company chose another, it was not ceasing to do business. That consequence did not follow merely because it discontinued the activities incident to continuing the discarded method.

The alternative one chosen was not a matter simply of licensing patents to others, for active exploitation by them. Nor was it only a casual act or acts of contracting. The whole framework of this phase of the New York activities was dictated by the master and supplemental agreements. These were not mere licensing arrangements, nor did they make Scophony nothing more than a shareholder for investment purposes, with only such a shareholder's voting rights and control in American Scophony. The contracts created controls in Scophony, and in the American interests as well, which taken in conjunction with the stock controls called for continuing exercise of supervision over and intervention in American Scophony's affairs.[25] We need not decide whether, in view of the agreements' continuing and pervasive effects, they could be considered as sufficing in themselves to make Scophony "found" within the New York district.[26]

---

[25] See note 22 *supra*. Indeed the contracts shaped the nature of the corporate distribution of powers and voting rights, so as to make them conform to the over-all character and objects of the larger common enterprise. The charter and by-law provisions of American Scophony therefore not only were governed by the contractual arrangements but carried them into execution.

[26] Especially in view of the fact that § 12 fixes venue and the places for serving process in antitrust suits, there would seem to be sound

Whether so or not, they set the pattern for a regular and continuing program of patent exploitation requiring, as we have said, Scophony's constant supervision and intervention.

That necessity was shown, among other ways, by the contractual provisions for interchange of data and information, and further by the fact that there was sustained interchange of correspondence between Levey and Scophony devoted to Scophony's affairs and interests in this country. Levey kept Scophony informed fully of all that went on here, and in turn received and carried out its instructions respecting American Scophony's affairs and its own.

In all this he was not acting merely as an officer of American Scophony. Rather he was also Scophony's director and representative, authorized to act in its behalf and interest. Indeed it was as Scophony's representative that he was named as president of American Scophony. His position was a dual one. He was not a mere shareholder's or investor's agent seeking information about that corporation's affairs for purposes of dealing with the stock. His functions and activities were much broader and related to Scophony's interests as much as to American Scophony's. Scophony's New York activities therefore were not confined to negotiation and execution of the agreements. Neither were they concerned only with mere stock ownership or "investment" as is urged, nor were they simply occasional acts of contracting, like those in the decisions appellee cites.

Moreover, other individuals carried on for Scophony in continuing efforts [27] to resolve the impasse. Apart

basis for differentiating the execution of agreements so all-pervasive and far-reaching in their effects upon the statutory policies from run-of-mine casual or intermittent sales of commodities by a manufacturing or selling company, for the section's purposes.

[27] See note 7.

from what was done by others, Elcock came to New York with unrestricted and irrevocable power to act on Scophony's behalf. Indeed it might almost be said, in view of his triple position as mortgagee, corporate officer and attorney-in-fact, that for all relevant purposes at this phase of Scophony's activity, he was the company. The stalemate put Scophony's affairs in this country at a standstill along with those of American Scophony. And Scophony's efforts to extricate itself were both strenuous and continuous.

Those efforts were not cessation of engaging in business. They were directed entirely to warding off that fate. Their object was not to liquidate, it was to resuscitate the business of Scophony and, as in all previous stages, put it on a normal course again. In doing all this, Scophony was engaging in business constantly and continuously, not retiring from it or interrupting it. Cf. *Mutual Life Insurance Co.* v. *Spratley,* 172 U. S. 602; *Pennsylvania Lumbermen's Insurance Co.* v. *Meyer,* 197 U. S. 407; *St. Louis S. W. R. Co.* v. *Alexander,* 227 U. S. 218. The interruptions were only in particular phases of its authorized adventure, not in the continuity, intensity or totality of the adventure itself.

In sum, we have no such situation as was presented in the manufacturing and selling cases on which appellee relies. They concerned entirely different facts and enterprises. In none was there a shifting from a course of business in pursuit of one corporate object or objects, *viz.,* manufacturing and selling, to another continuing mode of achieving a basic corporate objective, namely, the exploiting of patents by complex working arrangements partaking practically of the character of a common enterprise with others and requiring constant supervision and intervention beyond normal exercise of shareholders' rights by the participating companies' representatives *qua* such.

We know of no decision which has held or indicated that on such facts the process clause of § 12 is not adequate to confer power to make valid service. Such a continuing and far-reaching enterprise is not to be governed in this respect by rules evolved with reference to the very different businesses and activities of manufacturing and selling. Nor, what comes to the same thing, is the determination to be made for such an enterprise by atomizing it into minute parts or events, in disregard of the actual unity and continuity of the whole course of conduct, by the process sometimes applied in borderline cases involving manufacturing and selling activities.

For present purposes those decisions may be left untouched for the facts and situations in which they have arisen and to which they have been applied. But there could be no valid object in expanding their pulverizing approach to situations as different and distinct as this one, comprehended within neither their rulings nor their effects. More especially would such an extension be inappropriate, when it is recalled that § 12 governs venue and service in antitrust suits against corporations. For, in cases against companies incorporated outside the United States, that extension would bring back all the obstacles to enforcement of antitrust policies and remedies which existed for domestic corporations before § 12 was enacted to give relief from those obstacles. Even though venue were clearly established, as here, the extension often would make valid service impossible, since process could not be issued to run for such corporations to the foreign countries of which they are "inhabitants." We are unwilling to construe § 12 in a manner to bring back the evils it abolished, for situations not foreclosed by prior decisions, and thus to defeat its policy together with that of the antitrust laws, so as to make another amendment necessary.

We think that Scophony not only was "transacting business" of a substantial character in the New York district at the times of service, so as to establish venue there, but also on the sum of the facts regarding its activities was "found" there within the meaning of the service-of-process clause of § 12. Of course such a ruling presents no conceivable element of offense to "traditional notions of fair play and substantial justice." See *International Shoe Co.* v. *Washington, supra,* at 316; cf. *Hutchinson* v. *Chase & Gilbert,* 45 F. 2d 139, 141.

It remains only to say that we do not stop to consider whether, as is argued, Levey's authority to act for Scophony had expired or been revoked at the time service was made by delivery of process to him. For when service was made by delivery to Elcock, he had unrevoked and irrevocable authority to act in Scophony's behalf in the New York district, and that service was valid to confer personal jurisdiction over Scophony.

Accordingly, the judgment is reversed and the cause is remanded to the District Court for further proceedings in conformity with this opinion.

*Reversed and remanded.*

MR. JUSTICE JACKSON concurs in the result.

MR. JUSTICE FRANKFURTER, concurring.

I deem it appropriate to state why I concur merely in the Court's result.

The only question in this case is whether Scophony Limited, a British corporation, which has its offices and principal place of business in London, may be made a party defendant in a suit by the United States for violation of the Sherman Law pending in the Southern District of New York. The corporation may be brought into court in that District if its activities there satisfy the requirements of § 12 of the Clayton Act. According to

this provision, Scophony Limited is properly a party defendant in this suit only if, by virtue of its activities, it is "found or transacts business" in the Southern District of New York, and it may be served in that District if it is "found" there.

Whether a corporation "transacts business" in a particular district is a question of fact in its ordinary untechnical meaning. The answer turns on an appraisal of the unique circumstances of a particular situation. And a corporation can be "found" anywhere, whenever the needs of law make it appropriate to attribute location to a corporation, only if activities on its behalf that are more than episodic are carried on by its agents in a particular place. This again presents a question of fact turning on the unique circumstances of a particular situation, to be ascertained as such questions of fact are every day decided by judges.

What was done in the Southern District of New York on behalf of Scophony Limited, as detailed in the Court's opinion, establishes that the corporation was there transacting business and was found there in the only sense in which a corporation ever "transacts business" or is "found." Accordingly, Scophony Limited was amenable to suit and service in the District within the requirements of § 12 of the Clayton Act.

To reach this result, however, I do not find it necessary to open up difficult and subtle problems regarding the law's attitude toward corporations. I abstain from joining the Court's opinion not because I am in disagreement with what is said but because I am not prepared to agree. And I am not prepared to agree because I do not wish to forecast, which agreement would entail, the bearing of the Court's discussion upon situations not now before us but as to which such theoretical discussion is bound to be influential. Law, no doubt, is concerned with "practical and substantial rights, not to maintain theories."

*Davis* v. *Mills,* 194 U. S. 451, 457. But theories often determine rights. Since I do not know where the opinion in this case will take me in the future, I prefer to reach its destination by the much shorter route of recognizing that a corporation as such never transacts business and is never found anywhere, but does "transact business" and is "found" somewhere by attribution to the corporation of what human beings do for it. No doubt legal reasoning must be on its guard not to oversimplify. Dangers also lurk in overcomplicating.

From earliest times the law has enforced rights and exacted liabilities by utilizing a corporate concept—by recognizing, that is, juristic persons other than human beings. The theories by which this mode of legal operation has developed, has been justified, qualified, and defined are the subject-matter of a very sizable library. The historic roots of a particular society, economic pressures, philosophic notions, all have had their share in the law's response to the ways of men in carrying on their affairs through what is now the familiar device of the corporation. Law has also responded to religious needs in recognizing juristic persons other than human beings. Thus, in the Hindu law an idol has standing in court to enforce its rights. See, *e. g., Pramatha Nath Mullick* v. *Pradyumna Kumar Mullick,* 52 L. R. I. A. 245 (1925). Attribution of legal rights and duties to a juristic person other than man is necessarily a metaphorical process. And none the worse for it. No doubt, "metaphors in law are to be narrowly watched," Cardozo, J., in *Berkey* v. *Third Avenue R. Co.,* 244 N. Y. 84, 94. But all instruments of thought should be narrowly watched lest they be abused and fail in their service to reason.