**S. A. WENTLING, Plaintiff,**

v.

**POPULAR SCIENCE PUBLISHING COMPANY, Inc., National Rifle Association of America, Henry Holt and Company, Inc., Lyman Gun Sight Corporation, and John Unertl, trading as John Unertl Optical Co., Defendants.**

**Civ. A. No. 6300.**

United States District Court
M. D. Pennsylvania.

Sept. 11, 1959.

McNees, Wallace & Nurick, Harrisburg, Pa., for plaintiff.

Nauman, Smith, Shissler & Hall, Harrisburg, Pa., for defendant, Popular Science Pub. Co., Inc.

Whiteford, Hart, Carmody & Wilson, Washington, D. C., Carl F. Chronister, Harrisburg, Pa., for defendant, National Rifle Assn. of America.

Stock & Leader, York, Pa., for defendant, Lyman Gun Sight Corp.

FOLLMER, District Judge.

This is a private anti-trust action for treble damages under Sections 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2) and Section 12 of the Clayton Act (15 U.S.C.A. § 22).

It appears from the complaint that the plaintiff, S. A. Wentling, is a partnership composed of Stanley A. Wentling and F. Robert Kreider, with its principal place of business at Palmyra, Lebanon County, in the Middle Judicial District of Pennsylvania; that the defendants herein involved are

(a) Popular Science Publishing Company, Inc. (hereinafter referred to as "Popular Science"), a New York corporation with its principal place of business in New York City, also qualified to do business in Pennsylvania, with its principal registered office in Pennsylvania located at 400 Wyoming Avenue, Scranton.

(b) National Rifle Association of America (hereinafter referred to as "National"), a New York corporation with its principal office in Washington, D. C.

(c) Lyman Gun Sight Corporation (hereinafter referred to as "Lyman"), a Connecticut corporation with its principal office and place of business at Middlefield, Connecticut.

Action against John Unertl, trading as John Unertl Optical Co., was dismissed by order of court on stipulation of counsel.

Counsel for plaintiff and Henry Holt and Company, Inc., stipulated that Holt would not be required to answer or further plead until the motions hereinafter referred to were disposed of.

The matter is presently before the Court on

(a) Motion of National to dismiss the action as to it because of improper venue.

(b) Motion of Lyman to dismiss complaint as to it because of improper venue.

(c) Motion of Popular Science to quash the summons and dismiss the complaint as to it because

(1) Improper service.

(2) Because of plaintiff's failure to register under Pennsylvania Fictitious Name Act, 54 P.S.Pa. § 28.1 et seq., plaintiff has no capacity to maintain this action.

(3) Complaint fails to state a cause of action upon which relief may be granted.

(4) Complaint states two separate and distinct causes of action in a single count in disregard of Federal Rules of Civil Procedure, rule 10(b), 28 U.S.C.A.

(5) Complaint fails to state sufficient facts to establish defendant's involvement in any conspiracy as to plaintiff, that plaintiff was injured by defendant, or that any of alleged injuries or damages were caused by defendant.

In the alternative, Popular Science moves for more specific statement.

In the further alternative, Popular Science moves to strike certain alleged scandalous and impertinent statements.

The unverified complaint alleges, inter alia, that plaintiff is a partnership, engaged as a dealer, jobber and distributor

of gun scopes, binoculars, guns and various gun accessories, such business being substantially a mail order distribution of such products from its principal place of business located at Palmyra, Lebanon County, Pennsylvania; that beginning about 1950 and continuing through 1956 defendants and others named therein as coconspirators knowingly have entered into and engaged in an unlawful combination and conspiracy, carried out in part within this district, to eliminate and exclude plaintiff and other off-list dealers from engaging in the purchase and sale of scopes, binoculars, and gun accessories for the purpose of stabilizing and maintaining prices of scopes, which combination and conspiracy was in restraint of the therein described trade and commerce among the several states in violation of the Sherman and Clayton Acts.

The applicable venue section of the Clayton Act (15 U.S.C.A. § 22) provides in pertinent part as follows:

"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

*As to National Rifle Association of America.*

Attached to National's motion to dismiss was the affidavit of Frank C. Daniel, its Secretary, to which is attached copy of charter and amendment thereto.

National was incorporated in 1871 in the State of New York, pursuant to Act of April 11, 1865, entitled "An Act for the Incorporation of Societies or Clubs, for certain Social and recreative purposes." It is a nonprofit, nonbusiness, nonstock organization supported by membership dues. Its original objects or purposes are the "improvement of its members in markmanship, and to promote the introduction of the system of aiming drill and rifle practice as part of the military drill of the National Guard of this and other states, and for those purposes, to provide a suitable range or ranges in the vicinity of the City of New York." The charter was amended in 1956 in order to add the following purposes to those stated originally:

"And to promote social welfare and public safety, law and order, and the national defense; to educate and train citizens of good repute in the safe and efficient handling of small arms, and in the technique of design, production and group instruction; to increase the knowledge of small arms and promote efficiency in the use of such arms on the part of members of law enforcement agencies, of the armed forces, and of citizens who would be subject to service in the event of war; and generally to encourage the lawful membership and use of small arms by citizens of good repute."

Defendant's offices are located in Washington, D. C. It has no offices, employees or agents in Pennsylvania, nor has it ever applied for or been required to apply for a certificate of authority to do business in Pennsylvania, or any other state, territory or district.

As of December 31, 1957, defendant had some 313,967 individual and 7,644 organization members. Each member of defendant, as a privilege of membership, is entitled to receive the official monthly journal of defendant, "The American Rifleman," which is published and printed in the District of Columbia and is mailed monthly to each member from Washington, D. C. For the month ending December 31, 1957, defendant mailed some 23,035 copies of its journal to addressees in Pennsylvania, of this amount 21,246 copies were mailed to members, 119 copies were mailed to nonmembers (consisting mainly of persons who have sent in the full dues but who have not completed all of the requirements for active membership, a few libraries, and several military units), and some 1,670 copies were mailed to approximately 165 sporting goods deal-

ers for an average of approximately 10 copies each. The copies mailed to sporting goods dealers are purchased by them at Washington, D. C., on the basis of written orders received in and accepted in Washington, D. C. These dealers pay defendant 25 cents per copy and are free to dispose of the copies as they see fit. The purpose of these sales is to encourage interest in the defendant on the part of the dealers and their customers.

Plaintiff then filed an affidavit, the sole purpose of which was to place in the record a copy of defendant's magazine for October 1958, which it claims is the primary source of the present controversy.

Defendant filed a reply affidavit setting forth, inter alia, that the copy of the magazine attached to plaintiff's affidavit is a representative copy of the October 1958 issue of the magazine with one exception. The "bind-in-reply card" which appears therein was only inserted in the few issues sent to sporting goods dealers as set forth in original affidavit. The reply card is enclosed in these copies as an application for a "subscription" because the Post Office Department has taken the position that Section 132.481 of the Postal Regulations permits such an enclosure but does not permit enclosure of an application for membership. The "subscription rates" on the card are identical to the membership dues of annual members. On the receipt of reply card sender is advised he can become a full member at no further cost on fulfilling the necessary requirements. A detailed analysis of the mailing list of magazines sent into the Middle District of Pennsylvania per month showed

> 5,214 copies mailed to Annual Members
> 499 copies mailed to Life Members
> 58 copies mailed to Affiliated rifle and/or pistol clubs
> 126 copies mailed to nonconfirmed members as described in original affidavit
> 282 copies mailed to 37 sporting goods dealers

> 31 copies go to persons or organizations therein listed, including libraries, military units, State Game Commission, etc.

An analysis of the advertisements disclosed that in the October 1958 issue of the magazine eight classified advertisements (one of which was sent in by plaintiff) and six larger advertisements (one of which was sent in by plaintiff) are from persons in the Middle District of Pennsylvania. The gross revenue from these fourteen advertisements was $865.-55 of which $246.30 came from plaintiff.

At the argument on the motion plaintiff stated that for the purposes of the motion it relied upon the facts set forth by defendant in the said affidavits.

The sole issue here is whether plaintiff has established that defendant is transacting business in this district. After proper challenge, as here, the burden of proving proper venue pursuant to Section 12 is upon the plaintiff. Austad v. United States Steel Corp., D.C.N.D. Cal.1956, 141 F.Supp. 437. The test for determining whether a corporation is transacting business within a particular district is stated by the Supreme Court in Eastman Kodak Co. of New York v. Southern Photo Materials Co., 1927, 273 U.S. 359, 373, 47 S.Ct. 400, 403, 71 L.Ed. 684,

> " * * * a corporation is engaged in transacting business in a district, * * * if in fact, in the ordinary and usual sense, it 'transacts business' therein of any substantial character. * * * "

This test was reaffirmed in United States v. Scophony Corporation of America, 1948, 333 U.S. 795, 807, 68 S.Ct. 855, 862, 92 L.Ed. 1091. The Court added,

> " * * * The practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character' became the test of venue."

Attached to affidavit filed by defendant is a booklet entitled "Your NRA," which, in considerable detail, outlines the aims

and purposes of the organization and what it has to offer its members. Its magazine, The American Rifleman, is merely an incident to membership. Certainly the publication of the magazine is not the chief business of the organization. Probably the strongest argument against the claim that the magazine is commercial in nature is the Congressional recognition accorded the organization. By the Act of Congress of August 10, 1956, c. 1041, 70A Stat. 236 and 237, 10 U.S.C. §§ 4308 and 4312, respectively, Congress specifically authorized the sale of Government rifles and associated supplies to defendant's members at cost, and also recognized the basic patriotic nature of the organization by providing that competitions for which trophies and medals are provided by the National Rifle Association of America (this defendant) shall be held in connection with an annual competition called the "National Matches" and consisting of rifle and pistol matches for a national trophy, medals, and other prizes, which competition or matches shall be held as prescribed by the Secretary of the Army.

The fact that the magazine carries advertisements does not, in my mind, alter the picture, so do the official organs of such service organizations as Rotary, Kiwanis, Lions and indeed The American Bar Association. It could not be seriously contended that the chief purpose of any of those or similar organizations was the publication of its official magazine.

In the light of the foregoing, the motion of defendant National Rifle Association of America to dismiss it from this action on the ground that venue is improper over it in this district will be granted.

*As to Lyman Gun Sight Corporation.*

Attached to Lyman's motion to dismiss, dated June 16, 1958 and filed June 17, 1958, is the affidavit of Henry B. Leader, its attorney. Under date of April 2, 1959, Lyman filed affidavit of its President, Charles Lyman, 3rd, dated April 1, 1959. The Lyman affidavit confirmed and enlarged upon the Leader affidavit and set forth, inter alia, as follows, to wit:

Lyman is a corporation organized and existing under the laws of Connecticut, has not been domesticated in Pennsylvania, has no agent in Pennsylvania to receive process and has no subsidiary in Pennsylvania.[1] It does not solicit orders through salesmen in the district, has no resident agent or representatives, nor resident employees of any nature in the district. The Lyman product coming into the district is purchased by independent merchants based on orders received in Connecticut, and accepted or rejected by Lyman in Connecticut; no prices are established in Pennsylvania; no sales made in Pennsylvania, and no payments are received in Pennsylvania. Lyman neither maintains nor owns any office, factory, warehouse or other real estate or installation in this district, and pays no rents in this district. Lyman has no tangible personal property, no telephone listing and pays no business taxes in this district. Lyman has no corporate records or books of account, no bank accounts or stock transfer agent, and does no financing through institutions in the district. None of Lyman's shareholders or directors live in this district and no meetings of either group are held in this district. Lyman's magazine advertising is directed to a national audience and it does no local magazine, newspaper, radio or television advertising in the district.

Plaintiff propounded certain interrogatories to Lyman concerning Lyman's business activities in the Middle District of Pennsylvania. It was later stipulated by plaintiff and Lyman that the scope of the said interrogatories should be limited to the period between January 1, 1957 and May 20, 1958. The answers of Charles Lyman, aforesaid, to

---

[1]. While there is nothing in the pleadings to so indicate, it may be assumed that Lyman's principal place of business is in Connecticut.

the interrogatories thus limited disclosed the following:

Lyman's total dollar volume of sales for the year 1957 was $640,581, and for the year 1958 to May 20, was $169,318. Lyman's sales in the Middle District of Pennsylvania for the year 1957 amounted to 1.90 per cent of its total sales and to 1.37 per cent of its total sales for 1958 to May 20. During the period in question Lyman did some advertising in the Middle District of Pennsylvania, generally by catalogue, mail circular, letter, and magazine. During the period in question Lyman made no sales or deliveries in the Middle District of Pennsylvania through an agent, employee or distributor for the company. It did make sales at its home office in Connecticut to merchants who were independent contractors. Lyman listed seven merchants with places of business in the Middle District of Pennsylvania, six of whom bought Lyman's product in 1957 to the extent of $12,018, and six of whom in 1958 bought to the extent of $2,335. During the period January 1, 1957 to May 20, 1958, no employees, agents or independent representatives of Lyman came into the Middle District of Pennsylvania to effect the aforesaid sales. However, in April of 1957, Henry H. Lyman, Jr., Secretary of the company, and in March of 1958 Frank Jury, an employee, J. A. Widner, Jr., an employee, and Henry H. Lyman, Jr., Secretary as aforesaid, made good will tours which extended into this district.

In seeking to determine the question of venue with relation to Lyman, we have again to apply the test of "business of a substantial character" as above indicated originally propounded in Eastman, supra, and reaffirmed in Scophony, supra. The court in Scophony, supra, after noting that refinements such as previously were made under the "mere solicitation" and "solicitation plus" criteria were no longer determinative, and pointing out that in Eastman, supra, under the broader room given by Section 12 venue was held to have been established where under the earlier tests of Section 7 of the Sherman Act the company was not "present" either for the purpose of venue or as being amenable to service of process, then went on to say [333 U.S. 795, 68 S.Ct. 862]:

"Thus, by substituting practical, business conceptions for the previous hair-splitting legal technicalities encrusted upon the 'found'— 'present'—'carrying-on-business' sequence, the Court yielded to and made effective Congress' remedial purpose. Thereby it relieved persons injured through corporate violations of the antitrust laws from the 'often insuperable obstacle' of resorting to distant forums for redress of wrongs done in the places of their business or residence. A foreign corporation no longer could come to a district, perpetrate there the injuries outlawed, and then by retreating or even without retreating to its headquarters defeat or delay the retribution due."

█ The unmistakable trend both by legislation and by court decisions has been to expand the concept of what constitutes doing business in a state by a foreign corporation. While the volume of business done in the state has frequently been the controlling factor in arriving at this determination,[2] certainly it is not the sole test. In 1931 in Jeffrey-Nichols Motor Co. v. Hupp Motor Car Corporation, 1 Cir., 46 F.2d 623, 625, the court stated, "The sale of goods is not essential to constitute transacting business." See also Abrams v. Bendix Home Appliances, Inc., D.C.S.D.N.Y., 96 F.Supp. 3, 8. "It is the totality of acts and conduct rather than isolated and fragmented items thereof which must govern." Abrams v. Bendix Home Appliances, supra.

The problem here is well stated in Echeverry v. Kellogg Switchboard & Sup-

---

2. See Sunbury Wire Rope Manufacturing Co. v. United States Steel Corporation, D.C.E. D.Pa.1955, 129 F.Supp. 425.

ply Co., 2 Cir., 175 F.2d 900, 902–903, as follows:

> "The published decisions on what constitutes 'doing business' in a State by a foreign corporation are literally legion. Yet, in spite of this vast array of judicial authority, border-line cases still have to be decided each on its own peculiar set of facts, which too often cannot be fitted into a stereotyped pattern. In this field, realism, not formalism, should be dominant; the problem must be solved in the light of commercial actuality, not in the aura of juristic semantics. In United States v. Scophony Corporation, 333 U.S. 795, 810, 68 S.Ct. 855, 863, 92 L.Ed. 1091, Mr. Justice Rutledge spoke of 'the practical, nontechnical, business standard.'"

In 1957 defendant had gross sales of $640,581 of which 1.90% or $12,018 represented sales in the Middle District of Pennsylvania. For the period January 1 to May 20, 1958, defendant's total sales amounted to $169,318 of which 1.37% or $2,335 represented sales in the Middle District of Pennsylvania. During the period in question defendant engaged in a vigorous advertising and sales promotion campaign. It circularized the trade generally by mailing its catalogues, mail circulars and letters into this district and also advertised in various magazines which have circulation in this district. In addition, during April 1957 defendant caused its secretary to make "good will calls" in this district, and again in March 1958 it caused its secretary and two other employees to make similar "good will tours" in this district.

This defendant is not a philanthropic organization. It is in business to make money. In order to promote sales in this district it caused its catalogues and various advertising material to be circularized through the district, it made extensive use of magazine advertising media. Certainly, the good will calls or tours could have but one purpose, namely, to increase sales.

It is my opinion that from the average business man's point of view the activities of this defendant constitute the transaction of business in the Middle District of Pennsylvania.

The motion of Lyman Gun Sight Corporation to dismiss it from this action will be refused.

*As to Popular Science Publishing Co., Inc.*

As above indicated, Popular Science has moved to quash the summons and dismiss the complaint for reasons stated, in the alternative for more specific statement and to strike certain alleged scandalous and impertinent statements. Defendant has withdrawn its objections to certain paragraphs of the complaint.

Considering the reasons given in support of the motion, seriatim,

(a) Improper service. The Marshal's return reads as follows:

> "I hereby certify and return that on the 22nd day of May 1958, I received the summons and served it together with the complaint herein as follows: On the 23rd day of May, 1958, executed the within Summons by serving James Scott, Manager of the Popular Science Publishing Co., Inc., by making known to him the contents thereof and leaving with him a true attested copy of summons together with copy of complaint. Service was made at their office, 1136 Moosic St., Scranton, Pa."

Plaintiff filed of record affidavit of William E. Lavin, the Deputy Marshal who made the service and return. This affidavit sets forth the following:

> " * * * William E. Lavin, who being duly sworn according to law, deposes and says that he is a Deputy United States Marshal for the Middle District of Pennsylvania, and that in the course of his duties on May 23, 1958, he attempted to serve a Complaint in the case of S. A. Wentling v. Popular Science Publishing Co., Inc., Civil Action No. 6300 a defendant in said action, at

the registered office of said corporation as listed in the Complaint, namely, 400 Wyoming Avenue, Scranton, Lackawanna County, Pennsylvania; that upon arriving at said address it was apparent that there were no offices there at the time as the building was being remodeled and the window sign formerly indicating Popular Science Publishing Co. had been removed and the said defendant had no office at that address; that he then looked in the City Directory for the City of Scranton, Pennsylvania, and determined that there was set forth therein an address for said company at 1136 Moosic St., Scranton, Lackawanna County, Pennsylvania; and that he then served the said Complaint on May 23, 1958, upon one James Scott, at the office of said defendant at 1136 Moosic St., Scranton, Pennsylvania; and that the said James Scott was or held himself out to be the manager or person in charge of said place of business."

Attached to defendant's motion to quash summons and dismiss complaint was affidavit of Ralph H. Flynn, President of defendant. This affidavit set forth that James Scott is an employee of defendant whose sole duty consisted of supervising the operation of defendant's warehouse at 1136 Moosic Street, Scranton, Pennsylvania; that he is not an officer, director or managing agent of defendant; that his duties consist of being responsible for the inventory in the warehouse; that he has no discretionary power and receives orders from defendant's New York office; that he has no authority to enter into any contracts on defendant's behalf or to make business commitments of any kind on defendant's behalf.

Popular Science is a foreign corporation and it appears to be agreed was duly registered in accordance with the Business Corporation Law of the Commonwealth of Pennsylvania, Act of May 5, 1933, P.L. 364, art. X, § 1011, 15 P.S. § 2852–1011, in the Office of the Secretary of the Commonwealth of Pennsylvania, appointing the said Secretary as its statutory agent for the service of process and giving its registered office as 400 Wyoming Avenue, Scranton, Pennsylvania.

■ While it is difficult to understand why the plaintiff did not take the obviously simple, best and most proper method of making service on the Secretary of the Commonwealth, it is not the exclusive method. Furthermore, the defendant having changed its registered office address and having failed to note the change in the office of the Secretary of the Commonwealth, is in direct violation of the Act and should not be permitted to profit by its own dereliction.

Goodrich-Amram, Standard Pennsylvania Practice, § 2180(a)–9, states, inter alia:

"* * * The statutes permitting the registration of foreign corporations and similar entities to do business in the Commonwealth likewise require the designation of such an office. Therefore, in all cases except those where the corporation or similar entity is violating the statute or is exempt from registration, there will be on file, with a state official, an officially designated office of the corporation or similar entity. Most of the statutes permit this 'office' to be changed on application to an appropriate State officer, but the change may be effected only upon the simultaneous designation of a new office within the Commonwealth. For these reasons, it would not lie in the mouth of the corporation or similar entity to deny the validity of the existence of the office at the place specified in the registration papers. Service at such an 'office' could not be attacked by the corporation or similar entity as being a service made at a place which was not in fact the 'office.'"

■ Significantly, the affidavit of Ralph H. Flynn attached to defendant's motion states that Scott, the person upon

whom service was made, supervises the operation of defendant's warehouse in Scranton, Pennsylvania, that other employees of defendant who work at the same location are the assistants of Scott. It therefore would obviously follow that defendant had a place of business in the Commonwealth and that Scott was in charge of it. It further appears that Scott was, or held himself out to be, the manager or person in charge of the said place of business.

I think the service was proper.

(b) As to plaintiff's failure to register its fictitious name prior to the institution of this action.

 The complaint was filed May 20, 1958, the fictitious name was filed in the office of the Prothonotary of Lebanon County, Pennsylvania, on May 22, 1958, and in the office of the Secretary of the Commonwealth on May 21, 1958.

The Act in question, Act of May 24, 1945, P.L. 967, § 4, 54 P.S. § 28.4, provides, inter alia, that:

"* * * Before any such person or persons may institute any action in any of the courts of this Commonwealth or before any justice of the peace or magistrate thereof, on any cause of action arising prior to the filing of the application provided for in this section, such person or persons shall pay to the Secretary of the Commonwealth for the use of the Commonwealth a license fee or fine of twenty-five dollars ($25.00). * * *"

In neither instance was the fine provided by the statute paid.

This is not a diversity case. It is founded exclusively on a Federal statute. Accordingly, in this case this Court is not sitting as a State court.

Dealing with a similar situation, the court in O'Donnell v. Elgin, Joliet & Eastern Ry. Co., 7 Cir., 1942, 193 F.2d 348, 352, held as follows:

"* * * But it is different where the action, as in the instant case, is predicated upon a Federal right. As stated in Angel v. Bullington, 330 U.S. [183], at page 192, 67 S.Ct. [657], at page 662, 91 L. Ed. 832: 'Of course, where resort is had to a federal court not on grounds of diversity of citizenship but because a federal right is claimed, the limitations upon the courts of a State do not control a federal court sitting in the State.'"

Popular Science's motion to dismiss complaint on ground of lack of capacity to sue because of failure to file a fictitious name registered prior to the institution of this action is without merit and will be denied.

Defendant's (Popular Science) reasons (3), (4), and (5) above set forth, together with its alternative motion, can be summarily disposed of. The gist of this action is a single conspiracy. Defendant is fully advised. Whether plaintiff will succeed in establishing a conspiracy as charged is a horse of another color.

Defendant's (Popular Science) several motions will be denied.