**UNITED STATES of America, Plaintiff,**

**v.**

**The WATCHMAKERS OF SWITZERLAND INFORMATION CENTER, Inc., et al., Defendants.**

United States District Court
S. D. New York.
July 13, 1955.

Reargument Denied Sept. 15, 1955.
See 134 F.Supp. 710.

---

2. See 18 U.S.C. § 4082.

Stanley N. Barnes, Asst. Atty. Gen., Chicago, Ill., Marcus A. Hollabaugh, Washington, D. C., Richard B. O'Donnell, Spec. Asst. to the Atty. Gen., Malcolm A. Hoffmann, Spec. Asst. to the Atty. Gen., New York City, Mary Gardiner Jones, Cold Springs Harbor, Samuel B. Prezis, Washington, D. C., Trial Attys. for plaintiff.

Robert Perret, New York, N. Y., Appearing Specially for Federation Suisse Des Associations de Fabricants D'Horlogerie, Ebauches, S. A. and Eterna, A. G. Uhrenfabrik, Solinger & Gordon, New York City, of counsel.

Manning, Harnisch, Hollinger & Shea, New York City, for Gruen Watch Mfg. Co., S. A. Charles W. Newmark, and William Hughes Mulligan, New York City, of counsel.

Goodwin, Danforth, Savage & Whitehead, New York City, for Wittnauer Et Cie, S. A.

Donovan, Leisure, Newton & Irvine, New York City, of counsel, by James V. Hayes, William F. Clare, Jr., A. Pennington Whitehead, New York City.

WALSH, District Judge.

Five of the defendants in the above entitled action have moved to dismiss the complaint for lack of jurisdction over their persons. The motions were argued together.

In this action several Swiss and American organizations are charged with violations of the Sherman Act, 15 U.S.C.A. § 1, in that they allegedly have combined and conspired unreasonably to restrain interstate and foreign trade and commerce in watches, component parts and repair parts, and also with violation of the Wilson Tariff Act, 15 U.S.C.A. § 8. It may be roughly summarized as a claim that Swiss organizations compel American companies to restrict the manufacture and export of American made watches and parts in order to be allowed to obtain Swiss watches and parts. Two of the most powerful Swiss forces are Federation Suisse Des Associations de Fabricants D'Horlogerie (hereafter referred to as FH), and Ebauches, S. A. They are two of the moving defendants who claim not to be within the jurisdiction of this court.

Section 12 of the Clayton Act, 15 U.S.C.A. § 22 provides as follows:

"§ 22. District in which to sue corporation

"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

The question here is whether the moving defendants were found within this country, and properly served. "Found" requires something more than "transacting business". Eastman Kodak Co. v. Southern Photo Material Co., 273 U.S. 359, 370–374, 47 S.Ct. 400, 71 L.Ed. 684. United States v. Scophony Corporation of America, 333 U.S. 795, 817, 68

S.Ct. 855, 92 L.Ed. 1091, does not equate "found" to "transacting business" but it does require that the presence of a corporation within the jurisdiction be determined from a realistic appraisal of its overall business rather than upon the sum of the disassembled parts of that picture.

■ A corporation is "found" within the jurisdiction if it is "present" there. The question is whether there is proof of continuous local activities and whether under all the circumstances of the case, the forum is not unfairly inconvenient. Latimer v. S/A Industrias Reunidas F. Matarazzo, 2 Cir., 175 F.2d 184, 186, certiorari denied 338 U.S. 867, 70 S.Ct. 141, 94 L.Ed. 531; Kilpatrick v. Texas & P. Ry. Co., 2 Cir., 166 F.2d 788, 791; Hutchinson v. Chase & Gilbert, 2 Cir., 45 F.2d 139.

■ For proof of continuous activities within this jurisdiction by FH and Ebauches, the government relies on its claim that their jointly owned subsidiary, Watchmakers of Switzerland Information Center, Inc. (hereafter referred to as Watchmakers), itself a defendant, acts as their agent and upon the activities of Foote, Cone & Belding, another defendant.

FH is in many ways comparable to an American trade association, but has more power than customarily given such an association. It is a Federation of six regional organizations having a combined membership of over 450 and consisting of substantially all manufacturers and assemblers of jeweled Swiss watches. It conducts negotiations and acts for the industry in matters of great importance. According to its own claims, it was created in 1924 "in order to attempt to correct chaotic conditions which prevailed at that time in the watch industry". Its aims are described as follows:

"Article 4—The Federation has as its aim to watch over the general interests of Swiss watch manufacturers by:

"1. The coordination of the economic policy of its sections;

"2. The improvement and the fixing of conditions of manufacture, sale and exportation of watch products;

"3. The improvement of industrial conditions by the concluding of agreements with suppliers, their associations, or third parties;

"4. The supervision of the labor market and the study of questions relating thereto;

"5. The examination of all questions of interest to watch manufacturers, including those which are submitted to it by its sections or by the Swiss Watch Chamber."

Again, according to its counsel, it devotes the greatest portion of its activities to: "studying market conditions as they result from commercial treaties between Switzerland and foreign nations; advising on manufacturing problems including technological advances and labor conditions within Switzerland; and carrying on negotiations with the various associations of parts manufacturers, in order to establish, under Swiss law, the prices of parts purchased by FH members for the final manufacturing and assembling of watches."

Ebauches has an equally dominant position over the manufacture of certain watch parts known as ebauches. They include the parts of a jeweled watch movement other than the parts for the escapement and for fitting the watch. Ebauches is a holding company with controlling interest in eighteen principal manufacturers of these items. It represents that segment of the industry in negotiating agreements for the sale of of ebauches to assemblers and manufacturers, and with respect to other Swiss industry-wide agreements.

On April 1, 1931, FH, Ebauches and a third organization not a party here, UBAH (which represents the manufacturers of watch components and repair parts other than ebauches), acting on

behalf of themselves and their members, executed an agreement for the regulation of the production, sale and export of watches, component parts and repair parts of the Swiss watch industry, known as the Collective Convention. This Convention is still in effect. It restricts the activities of not only the Swiss firms, but their American affiliates as well. FH, Ebauches and UBAH are empowered to suspend purchases from or sales to any firm charged with its breach and to cancel the Convention membership of any violating firm whether the violation is by the firm itself or its foreign affiliates.

In 1947 in an effort to increase the sale of Swiss watches to American customers, Ebauches and FH jointly planned and have since then executed a program in the United States having two purposes: (1) to create a favorable public attitude toward Swiss watches; and, (2) to meet the greatest competitive disadvantage of these watches, the lack of easily obtainable repair parts. As a part of this program, FH established a new department known as its marketing department. FH and Ebauches jointly organized a New York corporation originally known as the Swiss Watch Repair Parts Information Bureau, Inc., and then renamed The Watchmakers of Switzerland Information Center, Inc. FH also retained the advertising firm Foote, Cone & Belding, to assist it in this campaign. Ebauches, through Watchmakers and Foote, Cone & Belding, standardized and facilitated the cataloguing and ordering of repair parts.

Watchmakers, which FH and Ebauches jointly created, is a New York corporation of which fifty percent of the stock is held by FH and fifty percent by Ebauches. It is a small organization having only nine employees and a budget of approximately $70,000 a year. Its General Manager is Paul Tschudin, a former employee of Ebauches. Its budget is submitted at the beginning of each year for the joint approval of FH and Ebauches, and Tschudin reports to these organizations monthly as to his actual expenditures and thus his activities. It performs advertising and promotional work in furtherance of the joint FH-Ebauches program, but claims that this is done on an industry-wide basis, rather than as an adjunct of FH or Ebauches. It also acts as a liaison agency in the servicing of the American market with Ebauches repair parts. It claims, however, that it performs the same function also with respect to parts not manufactured by Ebauches. It also collects trade information and this information is relayed to FH and Ebauches. It also receives information and takes action to protect Ebauches trademarks and parts from misuse.

Whether or not manufacturers of repair parts other than Ebauches derive advantages from the activities of Tschudin and Watchmakers, its activities have, from the beginning, been undertaken principally for the benefit of Ebauches. When Tschudin first came to the United States in 1946, for the purpose of setting up the repair parts program, he was an employee of Ebauches. In 1948, when Watchmakers was established, the first step in its program was the publication of a two-part catalogue codifying the identification system for all repair parts. The first part of the catalogue, published in 1948, was devoted exclusively to parts manufactured by Ebauches. The second part to contain an identification system for repair parts made by other manufacturers was promised for a year later. Foote, Cone & Belding, in its report to Ebauches on the progress of the repair program, emphasizes the advantages it derived from the activities of Watchmakers. Tschudin's correspondence with importers is concerned to a great extent with problems and transactions arising in connection with Ebauches parts. Finally, even to the extent that Watchmakers activities benefited manufacturers other than Ebauches, its activities were within Ebauches' policy of leadership in this program for the benefit of the industry and the indirect benefit to itself as one principally concerned with the industry's welfare.

Realistically appraised the Information Center has no business of its own. Its principal purpose was the advancement of the program of FH and Ebauches. The watch repair program it conducted was sponsored by FH and Ebauches directly (See Exhibit B, Hoffman affidavit May 5, 1955). Their officers were in this country when it was formulated and commenced, and almost annually thereafter. The fact that this was a minor rather than major part of their business does not make the activity of Watchmakers any less their own. Undoubtedly Watchmakers did benefit to some extent the entire watchmaking industry but there seems little room for doubt that it only intentionally benefited those who conformed to the policies of FH and Ebauches. Whether the correspondence shows that the Information Center was a "policing" agency, as claimed by the government, at least it shows that it was dedicated to the policies of FH and Ebauches.

Relying on Cannon Manufacturing Co. v. Cudahy Packing Co., 267 U.S. 333, 334–337, 45 S.Ct. 250, 69 L.Ed. 634, FH and Ebauches contend that they are not present here because it was there held that a parent's complete commercial and financial domination of its subsidiary did not bring the parent within the jurisdiction as long as the formal separation was scrupulously maintained. As to this rule, there is no dispute. See also Echeverry v. Kellogg Switchboard & Supply Co., 2 Cir., 175 F.2d 900, 903; Spacrab, Inc., v. Automatic Canteen Co. of America, D.C.S.D.N.Y., 101 F.Supp. 485, 486. On the other hand, where the substance of corporate independence is not preserved and the subsidiary acts as an agent of the parent, this corporate separation has been found without significance. Bator v. Boosey & Hawkes, D.C. S.D.N.Y., 80 F.Supp. 294, 296. Here the subsidiary has no independent business of its own. It does not buy from the parent and resell. It has no really independent stature. Like I. C. I. in the case of United States v. United States Alkali Export Association, Inc., (I. C. I.

case), Civ.No.24–464, S.D.N.Y., July 16, 1946 (Unreported Opinion page 6), it is a mere adjunct of its parents and its activities will be regarded as theirs.

The government also contends, at least as to FH, that it has also been continuously present through the activities of Foote, Cone & Belding. That firm, in addition to carrying on a widespread advertising campaign in this country on behalf of FH, also sent its executives regularly to principal trade conventions and meetings representing the "advertising agency of FH". Under direction of FH and with the advice of Ebauches, it participated in the repair parts program. Its activities in this regard are described by its own account executive as follows:

"a. Distribution of a catalog and sale of a dictionary to enable watch repairmen to order their parts according to a standardized system of identification;

"b. Introduction of a new system of distributing repair parts in packages identified according to the standardized nomenclature of the catalog;

"c. Announcement of the program and maintenance of interest in it through advertising and publicity releases in the jewelry and horological trade press;

"d. Educational work with horological associations so that members of these associations could be informed of the program through their own officers and association publications;

"e. Interesting editors of jewelry and horological trade magazines to publish articles which would enable the retail watch repairman to provide better service in the repair of Swiss jeweled-lever watches; and

"f. Rendering such other assistance as from time to time might seem appropriate."

Also, through its various local offices, it collected trade information, including deviations from the controlling policies

of FH and Ebauches which it relayed back to FH. In this regard the activities of Foote, Cone & Belding contribute proof of the presence here of FH. In its "educational" work its participation in conferences and meetings, it was the regularly accepted representative of FH whether it characterized itself as an "advertising agency" or some other kind of an agency. In United States v. United States Alkali Export Association, Inc., supra (Unreported Opinion page 8), Judge Leibell said:

" * * * The agents thus employed by a corporation are not restricted to the class of individuals, but may be partnerships, corporations or other forms of business entities. It would be anomalous to fix jurisdiction upon the acts of an individual agent and refuse to fix jurisdiction upon the same acts of a corporate agent. * * * "

It is not necessary to decide whether FH could be found present upon the activities of Foote, Cone & Belding alone. United States v. Scophony Corporation of America, 333 U.S. 795, 817, 68 S.Ct. 855, 92 L.Ed. 1091, does not favor such a "pulverizing" approach and I agree with Judge Leibell in United States v. United States Alkali Export Association, Inc., supra, page 7, that the particular facts of the case must be weighed together as a composite whole and not considered independently to determine whether each fact alone is sufficient to establish presence. It is enough to note that the activities of Foote, Cone & Belding round out the picture of presence based upon the activities of the Information Center.

██ Coming to the question of whether a trial in this forum would subject these two defendants to unfair inconvenience, it appears that there is no forum more convenient than this. As in Latimer v. S/A Industrias Reunidas F. Matarazzo, supra, defendant's home office is in a foreign country. Further, in this case, the relief sought could not be obtained there. The laws alleged to be violated are those of this forum. Many of the acts upon which the claim is based occurred here, although probably more occurred in Switzerland. The business transacted here is an important part of defendants' total business. The problems of proof in a case such as this would be difficult wherever the case was tried. The problem of gathering the evidence for trial here is not so overwhelming that I should conclude that these two defendants should not be tried at all. Taking into account the widespread international trade which these two organizations have undertaken to oversee, they may be expected to meet more easily than most the problems of trial in a distant forum.

Accordingly, as to these defendants, the motions are denied.

██ Two other moving defendants, Gruen, S. A. and Wittnauer, S. A., are Swiss manufacturers which are related by stock ownership to American companies of the same name which distribute their products in this country. Their presence is established only by attributing to them the activities of their American affiliates.

Gruen, S. A., is a wholly owned subsidiary of Gruen Watch Company, an Ohio corporation (hereafter referred to as Gruen Ohio). Both Gruen companies are defendants. Gruen, S. A. has no property in this country and does not directly carry on activities here. It is the theory of the government that although in form it is a subsidiary in actuality it controls its parent Gruen, Ohio. The record does not support this claim. The principal reliance of the government is upon correspondence between Benjamin Katz, President of Gruen, Ohio, and Henri Thiebaud, Manager of Gruen, S. A. Although Mr. Katz is deferential to Mr. Thiebaud, the correspondence does not establish Mr. Thiebaud's control. The deference is that often found in the person with financial control to the expert who possesses the know-how of the trade but not control. The correspondence does establish, however, the intimacy of the

relationship between the two companies and their common concern with the welfare of each and the subordination of their individual actions to a jointly formulated policy.

Wittnauer Et Cie, S. A. (hereafter referred to as Wittnauer), is a wholly owned Swiss subsidiary of the Longines-Wittnauer Watch Company (hereafter referred to as Longines), a New York corporation. Wittnauer assembles watches and sells them in Switzerland to distributors for resale. Longines is the exclusive distributor for the United States. Wittnauer has no property in the United States and does not directly carry on any activities here. It is the government's contention, however, that it controls Longines. The government's claim of control is based upon the Collective Convention to which Wittnauer is a signatory and which binds its foreign affiliates, and upon a letter from Wittnauer to Longines emphasizing that Longines must conform to the Collective Convention. The letter shows concern but not control.

As to both Gruen and Wittnauer, however, if the cause of action alleged is proved, the court has jurisdiction. Although in each case the American parent has financial control of the Swiss subsidiary, the complaint alleges that it has voluntarily subjected itself as an affiliate to the restrictive dominance of the Swiss industry. Granted the Swiss affiliate did not and could not compel the submission of the American parent, the American parent has submitted itself to important policy controls by its subsidiary by permitting the subsidiary to bind it to the Collective Convention and by permitting the subsidiary to participate as a member of FH. The American parent may have bought the Swiss company but the Swiss company through its know-how and its collective Swiss relationship determines what watches the American parent shall sell and at what price and terms and the American company has committed itself to acquiesce. Also, it has in a sense pledged its subsidiary to the controlling Swiss forces as an earnest for its own conduct in the United States. The Swiss affiliate may be fined or penalized for action by the American parent here. It is unrealistic to speak in terms of corporate separation when both have agreed that acts by one corporation visit penalties upon the other and that one as a member and in its dealings through FH sets the conditions for the actions of the other. To that extent the two affiliates do not deal with each other as independents and it is a sufficient dissolution of the corporate barrier to make the acts of one the acts of the other in determining "presence". Heeding United States v. Scophony Corporation of America, supra, taking an overall look at the Longines-Wittnauer relationships, they are a corporate partnership with a single program. Sanctions imposed in Switzerland upon Wittnauer coerce action by Longines. Restrictive trade practices in the United States market by Longines serve Wittnauer. Their commitments in Switzerland are that they will deal as one here. If the facts alleged in the complaint are true, the corporations have in fact dealt as one. See Giusti v. Pyrotechnic Industries, 9 Cir., 156 F.2d 351, 354. These conclusions are equally applicable to Gruen.

■■ For the purposes of a pre-trial motion the substantive allegations of the complaint are taken as true, even so far as they bear on jurisdiction over the person. Reese v. American Red Ball Transit Co., D.C.W.D.Pa., 107 F.Supp. 549, 550; McGuire v. Parker, D.C.W.D.Mo., 78 F.Supp. 199. Otherwise we would have to try out the entire complaint charged. Where the absence from the forum of a foreign corporation is determinable from factors apart from the nature of the cause of action (such as the absence of ownership of property, bank accounts, offices, etc.) and proof of the substantive allegations of the complaint would do nothing itself to establish its presence in the forum, a defendant's motion to dismiss can profitably be determined at a hearing in advance of trial.

In such a case, regardless of how it is decided it will narrow the issues to be tried, whereas here there would be no saving at best, and a complete duplication at worst. The whole tenor of F.R.C.P. 12(b), 28 U.S.C.A., points to the conclusion that a plaintiff is not to be put to the proof of the substantive allegations of his complaint on a pre-trial motion. In addition to the Reese and McGuire cases cited, supra, see also the analogous cases, Melanson v. Bay Store Dredging & Contracting Co., D.C.Mass., 62 F.Supp. 482, 485, in which the court refused to try out the question of maritime jurisdiction in advance of trial and Bagby v. Cleveland Wrecking Co., D.C.W.D.Ky., 28 F. Supp. 271, 272, in which the court refused in advance of trial to determine whether the transaction in question was interstate commerce and that it thus had jurisdiction of the subject matter.

Cannon Manufacturing Co. v. Cudahy Packing Co., supra, distinguished cases like the one at bar. Justice Brandeis said:

"* * * There is here no attempt to hold the defendant liable for an act or omission of its subsidiary or to enforce as against the latter a liability of the defendant. * * *" 267 U.S. at page 337, 45 S.Ct. at page 251.

He cited cases where on the question of substantive liability corporate independence was disregarded, a tax case, a patent infringement case and two cases relating to railroad regulation. It is a fair implication from the opinion that if corporate entities may be disregarded to establish liability they may also be disregarded in establishing jurisdiction over the person insofar as it depends upon the acts upon which the substantive liability was based. Antitrust violations are analogous to the subject matter of the cases Justice Brandeis distinguished.

Here there is a further distinction, jurisdiction over the parent is not being sought through a subsidiary but jurisdiction of the subsidiary is being sought through the parent. We are free of the danger that a corporation may be drawn into litigation in a strange forum by the acts of someone relatively unfamiliar with its major policies and unimportant in its corporate hierarchy. Here, the court already has jurisdiction over the parental policy making body which gave its deliberate assent to the alleged unlawful enterprise. It is not too violent an act to extend jurisdiction to the subsidiary through which the policy in question, lawful or unlawful, was in a large measure to be carried out.

■ As to the possibility of unfair inconvenience in compelling the two Swiss companies to stand trial here, we have the counterbalancing factors that there is no other more convenient forum in which they may be tried. As to the very subject matter of this action, if the complaint be true, they have so intertwined their action with that of their American affiliates that it would be unwise to attempt to force separate trials even if they could be had. Such a severance of defendants might well emasculate the proof of the plaintiff as well as prevent its obtaining the complete injunctive relief to which it would be entitled. Further, the long and intimate relationship between Swiss and American affiliates and the complete lack of conflicting financial interests between them assures that the facilities of the parental home office will provide the Swiss affiliate with a well equipped and hospitable base from which to pursue its litigation in this forum. Balancing the inconveniences to the two Swiss companies Gruen and Wittnauer against the inconveniences to the plaintiff if their cases were severed and dismissed, it is my conclusion that it is not unfair to compel them to stand trial here.

Accordingly, Gruen, S. A. and Wittnauer Et Cie, S. A. were properly found here and served and their motions must be denied without prejudice, of course, to any motion based upon the proof actually adduced at the trial.

■ The fifth moving defendant is Eterna A. G. Uhrenfabrik (hereafter re-

ferred to as Eterna A. G.). It is a Swiss corporation manufacturing watches under the name "Eterna". Its sole United States distributor is Eterna Watch Company of America (hereafter referred to as Eterna N. Y.), a New York corporation, also a defendant in this action. Eterna N. Y., although once a wholly owned subsidiary of Eterna A. G., is no longer so held. It was transferred to two other Swiss firms on January 1, 1952. Eterna states that Eterna N. Y. was originally an independent distributor of Eterna watches. On March 16, 1939 Eterna A. G. bought its entire capital stock. In 1952 it decided to sell it, however, because of difficulties in supervising and distribution at such a distance from its principal place of business. There consideration recited for the transfer was one dollar. Eterna N. Y., however, agreed in consideration for its designation as sole distributor of Eterna products; that it would not handle competing products; that it would have a sales policy which would protect the name "Eterna", that it would not re-export Eterna products; that it would employ a sales manager whose exclusive work would be the sale of Eterna products; that it would conduct its organization so as to ensure that "Eterna" at all times would "legally be an autonomous business enterprise in the United States". It was also part of the understanding that the then staff of Eterna N. Y., would be continued. It also agreed to discuss in advance proposed advertising and publicity as to Eterna products. The agreement required continuance of the then corporate office except upon Eterna A. G.'s approval of change. Eterna A. G. held title to the furniture until the distribution agreement ran five years. The contract is subject to termination by either party on six months notice. The agreement between Eterna A. G. and the parents of Eterna, N. Y. provide that in the event of termination of the distribution agreement, Eterna A. G. has the option to compel them to reconvey the corporate stock of Eterna N. Y. for a nominal consideration. The distribution agreement also gives Eterna A. G. the option to require Eterna N. Y. to drop "Eterna" from its name if the distribution agreement is terminated. Eterna claims that these provisions are simply to protect its name, that the agreement for recovery of the stock for a nominal consideration anticipated a reconveyance of the shell of the corporation stripped of the assets and liabilities.

Correspondence between Eterna A. G. and Eterna N. Y. shows that the former maintained a vigilant observation upon the latter's sales policy and called upon both Eterna N. Y. and its Swiss parents to account for certain objectionable sales tactics. Nevertheless, it also appears that Eterna N. Y. persisted in some of these practices which Eterna A. G. found objectionable.

The first question is whether the independence of Eterna N. Y. is so reduced that its activities become the activities of Eterna A. G. The absence of corporate affiliation is not controlling. If Eterna N. Y. is merely the local agent of Eterna A. G. rather than one who independently buys from it for resale, its activities may be attributed to its principal. The arrangement between the two organizations seems to be that Eterna N. Y. may operate independently only as long as it does as Eterna A. G. wishes on major matters. If it fails to acquiesce on a matter of major importance, Eterna A. G. has power not only to cease doing business with Eterna N. Y., but to resume control of the corporation and operate it itself. Again it is unrealistic to think that the employees and officers of Eterna N. Y., with such a possibility before them, feel free to deal independently with Eterna A. G. The distribution agreement under these circumstances reduces Eterna N. Y. to the status of agent. See Bach v. Friden Calculating Mach. Co., 6 Cir., 167 F.2d 679; Clover Leaf Freight Lines v. Pacific Coast Wholesalers Ass'n, 7 Cir., 166 F.2d 626; Carroll Electric Co. v. Freed-Eisemann Radio Corp., 60 App.D.C. 228, 50 F.2d 993.

**50**

As in the cases of the other moving defendants, to require Eterna A. G. to stand trial here would not subject it to unfair inconvenience. There is no alternative forum. The cause of action arose here. Many of the acts in question are alleged to have occurred here. The volume of its business with Eterna N. Y. and its long standing relationship with its personnel should enable it to minimize the disadvantage of a trial away from its home office.

Each of the defendants' motions is denied. Settle order on notice.