**Matter of the Grand Jury Subpœna Duces Tecum Addressed to ELECTRIC & MUSICAL INDUSTRIES, LTD., MIDDLESEX, ENGLAND, c/o Electric & Musical Industries, (U.S.) Ltd., 38 West 48th Street, New York 20, New York.**

United States District Court
S. D. New York.
June 27, 1957.

Richard B. O'Donnell, Harry G. Sklarsky, Herman Gelfand, and Ralph S. Goodman, Attorneys, Department of Justice, New York City, for the United States.

Dwight, Royall, Harris, Koegel & Caskey, New York City, John A. Wells, Justin W. D'Atri, and Stanley Godofsky, New York City, of counsel, for Electric & Musical Industries Limited, appearing specially.

WALSH, District Judge.

Electric & Musical Industries Ltd. moves to quash a subpoena directed to it and served upon its American subsidiary, Electric & Musical Industries (U.S.) Ltd. It claims that it is not within the jurisdiction of this Court because it is not present in this country. It further contends that E.M.I. (U.S.) is not its agent and that service upon E.M.I. therefore cannot be made through the officers of E.M.I. (U.S.). The motion is denied.

The subpoena was issued in aid of a current grand jury investigation of possible violations of the anti-trust laws through cartel activities in the radio-television industry.

Such a subpoena may run to any district in the United States. Clayton Act § 13, 38 Stat. 736, 15 U.S.C.A. § 23. Service must be made by delivering a copy thereof to the person named. Fed. R.Civ.P., Rule 45(c), 28 U.S.C.A.; Fed. R.Cr.P., Rule 17, 18 U.S.C.A. In the absence of any rule to the contrary, service upon a corporation may be made by delivering a copy of the subpoena to an officer or a managing or general agent of the corporation named. See Fed.R. Civ.P., Rule 4(d). This agent may be an individual, a partnership, or another corporation. United States v. United States Alkali Export Association, Inc. (I.C.I. case), Civ. No. 24–464, S.D.N.Y., July 16, 1946 (Unreported opinion, p.

8); United States v. Watchmakers of Switzerland Information Center, D.C.S.D.N.Y., 133 F.Supp. 40, 46.

■ Like other process issued pursuant to the anti-trust statutes, a subpoena may be served only in a district in which the person named is "found". Section 12 of the Clayton Act (38 Stat. 736; 15 U.S.C.A. § 22) provides:

"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found".

Accordingly, the question is whether E.M.I.'s activities within this district are sufficient to sustain service here, and, if they are, whether E.M.I. (U.S.) Ltd. is a proper agent upon which to effect service.

E.M.I. is a British corporation. It has subsidiaries in twenty-four countries. It is a manufacturer of (1) gramophone records; (2) domestic electronics, including radio, television, gramophones, household appliances, dictating and tape machines, relay and sound amplification equipment; and, (3) electronic capital equipment, that is, electronic equipment for industry and commerce, such as television transmitting equipment, electronic business machines, and other equipment used by aircraft and as aids to navigation.

With respect to the United States, E.M.I.'s activities are as follows:

1. Radio and television patents. It holds United States patents upon apparatus for radio and television. It has granted to Radio Corporation of America a non-exclusive license and the right to grant non-exclusive licenses to others with respect to these United States patents in return for a similar grant by R.C.A. with respect to patents held by it outside the United States, Canada and Australasia.

2. Gramophone records. E.M.I. is the largest producer of gramophone records in the world. As stated in its 1956 annual report, it is "strongly represented" in the United States by two subsidiaries: Capitol Records, Inc., and E.M.I. (U.S.) Ltd.

Capitol is a California corporation. It is one of the largest producers of records in the United States. In 1954 E.M.I. acquired 96.4% of its common stock. Three of its nine directors are now officers or directors of E.M.I. but there has been no change in its management.

The second United States subsidiary is E.M.I. (U.S.) Ltd., a New York corporation, which concentrates upon the classical field in which its sales have become the fourth largest in the United States. It was organized in 1953. It became the licensee of E.M.I.'s listings under the Columbia label, replacing Columbia Recording Corporation, another American corporation which had enjoyed this position in prior years.[1] Next year it is expected to gain similar rights with respect to E.M.I.'s other classical label, His Master's Voice, which since 1901 has been licensed to Victor (now RCA-Victor). The development of E.M.I. (U.S.) Ltd. was apparently part of a larger plan by which E.M.I. decided to depend upon its own sales organizations for the exploitation of the United States market, rather than upon its former contractual arrangements with RCA-Victor and Columbia.[2] It is appar-

---

1. From 1935 to 1954 this arrangement had been embodied in a contract between Columbia Recording Corporation and a wholly owned British subsidiary of E.M.I., Columbia Gramophone Company Limited.

2. Its 1956 annual report states:

"Now I want to explain to you the reasons for the ending—after more than half a century of collaboration—of the matrix and artists exchange agreement between His Master's Voice and R.C.A. Victor.

"This step was the logical result of our experiences in the last three years, since

ently underset by a policy of sharpened competition with RCA-Victor which apparently has invaded the European field.[3]

E.M.I. (U.S.) Ltd. was organized pursuant to an agreement with a former independent record producer, Dario Soria, who became its president. E.M.I. financed the new company, holds all of its preferred stock and all of its voting ordinary stock. Soria has a twenty-five percent equity interest represented by non-voting stock which he must offer to E.M.I. before selling or encumbering. Of the five man board of directors, three are officers or directors of E.M.I.; two are Americans, including Soria. Soria states that he has in large part taken over his own pre-existing organization. His management of the American company is substantially without interference by the parent.

It is my conclusion that under the holding of United States v. Scophony Corp., 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091, E.M.I.'s activities in this district are adequate to support the service of process.

Looking first to "the whole course of conduct" as urged by that opinion, it is apparent that E.M.I. is in world-wide conflict for supremacy in the field of musical recordings; that the United States is one of the most important world markets; that E.M.I. has two organizations here which it is using not as mere distributors which buy its products for resale but as reciprocating partners in this competition, partners who

the termination of a similar agreement we had with Columbia Records of America. As long as we were contractually tied to American sales organisations they had a free hand to publish or not to publish the vast wealth of our European catalogues. In 1953 we established E.M.I. (U.S.) Ltd. to sell our Columbia classical recordings in the U.S.A. In less than three years Angel—the trade mark under which we now sell the European Columbia catalogue in America—has made us one of the four leading classical record companies in America with an unrivaled reputation for the superior artistic and technical qualities of our records made with British producers, British technicians and pressed in our own Hayes factory.

"With our own powerful and enterprising sales organisations in America—Capitol and Angel—we shall, within a few months, be in a unique and unprecedented position properly and profitably to sell in the Americas the vast resources of Europe of which E.M.I. has the lion's share."

3. Thus, the president of E.M.I. (U.S.) has reported to the chairman of E.M.I. (England):

"The future of E.M.I. (U.S.) Ltd., as a subsidiary of E.M.I. Ltd., is dependent on the development of its parent company. In appraising the future, two new elements have entered the picture.

"1) *The world expansion of RCA Victor.*

"RCA is now establishing its label beyond the western hemisphere and is encroaching on the European market.

"2) *The expansion on this continent of E.M.I. Ltd.*

"Through the recent acquisition of Capitol, E.M.I. Ltd. now has two companies in the United States, one specializing in the popular field, the other in the classical field. Through Capitol, E.M.I. Ltd. has also fortified its international position in the popular field.

"The purchase of Capitol relieves Angel of the obligation to promote popular music and artists from E.M.I.'s European labels. With the exception of a small catalogue on its Blue Label of 'light music from the Continent', folk music, and special 'snob' items, it is free to concentrate all its efforts on the development of Angel as a major classical label.

"With the bold growth of RCA Victor in the foreign field, it will be advisable and necessary for E.M.I. Ltd. to give new life to the traditional HMV label and to rebuild its catalogue to the same strength as the Angel-Columbia catalogue. This will be a healthy and constructive move not only for the world market but for America where HMV has been languishing.

"When E.M.I. (U.S.) Ltd. was founded it was planned that if and when other E.M.I. Ltd. classical labels became free in this country, they would be transferred to Angel. With the coming expiration of the RCA–HMV contract, E.M.I. (U.S.) Ltd. envisages a magnificent and musically balanced future catalogue, drawn from European Columbia, HMV and Pathe, which will assure proper and equal promotion, sales and artist representation for each of the various elements concerned."

record both European and American artists and European and American music for distribution by E.M.I. abroad, as well as distribute E.M.I. listings here, and which are headed by men of aggressiveness, independence and prestige whose contribution to the E.M.I. organization goes beyond that of local distribution and includes the building up of a substantial part of the total E.M.I. repertoire, as well as counsel in the tactics of this competitive struggle. It was precisely this loyalty which E.M.I. was unable to develop under its former contractual arrangements notwithstanding their exclusivity and the express provisions emphasizing the personal quality of their joint undertakings and the duty to exchange information and promote each other's labels. It was precisely in order to secure the loyalty of Soria and Wallichs (President of Capitol) as its agents that E.M.I. in substance bought out their respective organizations. Once this agency is recognized, there is no doubt as to the continuity of the activity. E.M.I. (U.S.) Ltd. sells 1,250,000 records per year producing $3 million in revenue. Capitol's sales are over $25 million.

Here, as in the Scophony case, E.M.I. relies upon the cases which hold that a manufacturing parent cannot be said to be present upon the basis of business done by a distributing subsidiary. Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634; People's Tobacco Co. v. American Tobacco Co., 246 U.S. 79, 38 S.Ct. 233, 62 L.Ed. 587 and the dictum in Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684. Although not overruled, these precedents were limited to

their facts by the holding in the Scophony case, 333 U.S. at page 816, 68 S.Ct. at page 865. The court held that without reappraising their validity it was enough that they not be extended to defeat an anti-trust complaint against a foreign national. See 333 U.S. at page 817, 68 S.Ct. at page 866. In other words, we may still indulge in a heavy-handed fiction of corporate personality to protect a parent corporation from service outside of a state in which it is active but there is a clear warning in Scophony that such a fiction is not to be used to protect the parent from being served at all, particularly in a proceeding under the anti-trust laws.[4] The practical reality of these holdings should not be lost by laboring the fiction by which they were rationalized. The prevention of unfair forum-shopping in private litigation does not necessitate allowing a corporate veil to block a grand jury investigation into crime, particularly a violation of the anti-trust laws.

It would not be unfairly inconvenient to require the petitioner to stand trial in this district. See Latimar v. S/A Industrias Reunidas F. Matarazzo, 2 Cir., 175 F.2d 184, 186, certiorari denied 338 U.S. 867, 70 S.Ct. 141, 94 L.Ed. 531; Kilpatrick v. Texas & P. Ry. Co., 2 Cir., 166 F.2d 788, 791, certiorari denied 335 U.S. 814, 69 S.Ct. 32, 93 L.Ed. 369; Hutchinson v. Chase & Gilbert, 2 Cir., 45 F.2d 139. And there will, of course, be no need for a trial if the petitioner produces the records which the grand jury requests.

No question was raised in this motion as to the scope of the subpoena.

The motion is denied.

It is so ordered.

4. Anderson v. British Overseas Airways Corp., D.C.S.D.N.Y., 144 F.Supp. 543; State Street Trust Co. v. British Overseas Airways Corp., D.C.S.D.N.Y., 144 F.Supp. 241 and Lane v. Maple Leaf Milling Co., D.C.S.D.N.Y., 87 F.Supp. 741, may be in conflict with these views but they need not be considered because none of them purports to interpret section 12 of the Clayton Act.