699 F.2d 1254
 226 U.S.App.D.C. 102, 4 Employee Benefits Ca 1201
 I.A.M. NATIONAL PENSION FUND, BENEFIT PLAN A, Eugene Glover
and Lester F. Gettel, Jr., Appellants,
v.
WAKEFIELD INDUSTRIES, INCORPORATED, DIVISION OF CAPEHART
CORPORATION, Appellee.
 No. 81-1883.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 27, 1982.
Decided Feb. 11, 1983.
 
 Appeal from the United States District Court for the District of Columbia (D.C. Civil Action No. 80-1626).
 Robert T. Osgood, Washington, D.C., for appellants.
 Joseph H. Sharlitt, Washington, D.C., with whom Harvey A. Levin, Washington, D.C., was on the brief, for appellee, Margolis.
 Before WILKEY, Circuit Judge, and FAIRCHILD* and ROBB, Senior Circuit Judges.
 Opinion for the Court filed by Senior Circuit Judge FAIRCHILD.
 Separate opinion concurring filed by Circuit Judge WILKEY.
 Separate opinion concurring in part and dissenting in part filed by Senior Circuit Judge ROBB.
 FAIRCHILD, Senior Circuit Judge.
 
 
 1
 Plaintiffs appeal the vacating of a civil contempt order issued against the president of defendant corporation for failure to comply with an injunction directed to defendant and its officers. The appeal raises the questions whether there was sufficient service of the summons on defendant and whether there was sufficient service of the civil contempt motion on the president.
 
 
 2
 Defendant Wakefield Industries, Incorporated is a Connecticut corporation. It is a wholly owned subsidiary of Norwich Electronics, Inc., which in turn is a wholly owned subsidiary of Capehart Corporation. Defendant was named in the summons and complaint as "Wakefield Industries, Incorporated, Division of Capehart Corporation." The president of defendant is Marvin Margolis; he is the sole appellee appearing here.
 
 
 3
 Plaintiffs are trustees of I.A.M. National Pension Fund, Benefit Plan A, an employee pension benefit plan administered in the District of Columbia under the provisions of Section 302 of the Labor-Management Relations Act, 29 U.S.C. Sec. 186 and, Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Secs. 1001-1461.
 
 
 4
 On July 1, 1980, plaintiffs brought suit against Wakefield Industries, Incorporated to compel compliance with defendant's obligations under a Trust Agreement, executed in 1977 pursuant to a collective bargaining agreement with an I.A.M. Local Lodge. Among other things, the Trust Agreement obligated defendant to file monthly reports and make monthly contributions to the Pension Fund on behalf of employees at its Norwich, Connecticut manufacturing plant. The complaint was filed in the United States District Court for the District of Columbia. Because the plan is administered in the District of Columbia, action in that district was authorized by 29 U.S.C. Sec. 1132(e)(2). The summons and complaint were served by a deputy marshal on Margolis at the office in New York of Capehart Corporation, of which he is also president.
 
 
 5
 Wakefield Industries did not answer the complaint and a default judgment was entered against it on August 20, 1980. The judgment directed Wakefield and its "officers, agents, successors, and assigns" to prepare reports of all debts owing to the Pension Fund and enjoined them from refusing to make reports and contributions to the Pension Fund as they came due. A copy of the judgment was mailed to Wakefield Industries at Margolis' New York office, and six months later was personally served on Margolis at the same address. Wakefield Industries still did not respond, and on February 10, 1981 the Pension Fund moved the district court to hold both Wakefield Industries and Margolis in civil contempt.
 
 
 6
 The contempt motion was mailed to Margolis on February 10, 1982 at the same New York address at which the complaint and default judgments were served. Sixteen days later, with no answer from Wakefield Industries or its president, the district court found Wakefield Industries and Margolis in civil contempt, imposed a fine of five hundred dollars ($500.00) to be paid to the Pension Fund, and directed the contemnors to comply with requirements of the Trust Agreement as well as pay the Pension Fund its costs of litigation within ten days of service of the contempt order or face a fine of twenty-five dollars a day.
 
 
 7
 The contempt order was personally served on Margolis at his home and at his Capehart office. Again, there was no response. On April 16, 1981 the Pension Fund moved the court for an order to commit Margolis for contempt. It was at this point that counsel for Margolis appeared before the district court with a motion to vacate the civil contempt order.
 
 
 8
 Counsel argued that (1) while Margolis should have responded sooner to the Pension Fund's complaint, he was unable to comply any further with the terms of the Trust Agreement because of the financial straits of Wakefield Industries and Capehart Corporation, and (2) Margolis was served with the contempt motion in New York City, well outside the territorial limits of a federal district court sitting in the District of Columbia. In vacating its civil contempt order, the district court was persuaded by this second argument. The court noted that Margolis was served with the contempt motion based on ERISA's extraterritorial service of process provision, Section 1132(e)(2). Because the court believed this provision only authorized service on defendants to the action, and because Margolis was not a named defendant, the court held that it lacked personal jurisdiction over him and vacated the contempt order. Plaintiff Pension Fund appeals.
 
 I.
 
 9
 While the district court decided that it lacked personal jurisdiction over Margolis, on appeal Margolis argues, additionally, that the defendant corporation was never served; hence the district court had no jurisdiction to enter the injunction which Margolis is alleged to have violated.
 
 
 10
 There may well be doubt whether Margolis can properly challenge the district court's personal jurisdiction over the defendant corporation. Plaintiffs, however, have not claimed that the question was improperly raised, but have argued its merits.
 
 
 11
 The question of the district court's jurisdiction over Wakefield Industries arises under the special provisions of ERISA governing venue and service of process. Section 1132(e)(2) provides:
 
 
 12
 Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.
 
 
 13
 29 U.S.C. Sec. 1132(e)(2) (1975). As noted, the action was brought in the district where the plan is administered. The question then is one of service: whether the defendant Wakefield Industries was "found" in the Southern District of New York within the meaning of Section 1132(e)(2).
 
 
 14
 The leading case interpreting Section 1132(e)(2) is Varsic v. United States District Court for the Central District of California, 607 F.2d 245 (1979). In that decision the Ninth Circuit was called upon to decide where an unincorporated association could be "found" for purposes of establishing venue. The Ninth Circuit held that Congress intended, by allowing venue wherever a defendant might be "found," to permit suit in any district where a defendant entity's contacts "are sufficient to satisfy the 'minimum contacts' test for personal jurisdiction" as defined by International Shoe Co. v. Washington, 326 U.S. 310, 318-19, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945). Id. 607 F.2d at 248-49. See also Bostic v. Ohio River Co. (Ohio Division) Basic Pension Plan, 517 F.Supp. 627, 633 (S.D.W.Va.1981) (following the Varsic interpretation of "may be found" under Section 1132(e)(2)).
 
 
 15
 International Shoe sets forth a test for sufficient presence within a state to permit the exercise of personal jurisdiction by the state's courts under the Due Process Clause of the Fourteenth Amendment. Under Section 1132(e)(2), however, the question is not one of constitutional due process but of congressional intent in prescribing a test for venue in federal district courts. In earlier cases it has been said that a corporation is "found" in a district when its officers and agents are present, carrying on the business of the corporation. See, e.g., People's Tobacco Co. v. Am. Tobacco Co., 246 U.S. 79, 84, 87, 38 S.Ct. 233, 234-35, 62 L.Ed. 587 (1918). In so deciding, however, the Court seems to have applied the content of the then controlling due process test for state judicial jurisdiction. See Commercial Mutual Accident Co. v. Davis, 213 U.S. 245, 255, 29 S.Ct. 445, 448, 53 L.Ed. 782 (1909). The Ninth Circuit's resort in Varsic to the current due process test for in personam jurisdiction of a corporation to determine the meaning of "found" as a venue requirement is, we think, sound.[1]
 
 
 16
 In this case, there is no dispute as to the propriety of venue in the District of Columbia. Our question is whether the defendant corporation was "found" in the Southern District of New York so that service there was authorized by Section 1132(e)(2). In those few decisions which have addressed the question of where a corporation is "found" under federal service of process statutes, the same definition developed when the word is a requirement for venue seems to have been applied. See, e.g., United States v. Scophony Corp., 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948); United States v. Aluminum Co. of America, 20 F.Supp. 13 (S.D.N.Y.1937).
 
 
 17
 We have no doubt that Congress might have provided a standard for service of process different from the standard for venue. We conclude, however, that because Congress used the term "found" both in the provision for venue and the provision for service and because the history of judicial pronouncements on the meaning of that term for corporate presence in both venue and service of process provisions suggests no reason for according different meanings, the intended standards are the same. It follows that for service of process on a corporation to be valid under Section 1132(e)(2) a corporation's contacts with the district of service must meet the International Shoe test.[2]
 
 
 18
 The defendant corporation, Wakefield Industries, was therefore properly served with process in New York only if it had sufficient contacts of a "quality and nature" such that it is "reasonable" and "fair" to require it to conduct its defense in that State. Kulko v. Superior Court of California, 436 U.S. 84, 92, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978) (applying International Shoe, 326 U.S. at 316-17, 319, 66 S.Ct. at 158-59, 160). The Ninth Circuit suggests that a defendant falls under this standard and is "found" within a state under Section 1132(e)(2) if either of two tests are satisfied. First, "[i]f the nonresident defendant's activities within a state are 'substantial' or 'continuous and systematic,' there is a sufficient relationship between the defendant and the state to support jurisdiction even if the cause of action is unrelated to the defendant's forum activities." Varsic, 607 F.2d at 249 (quoting Data Disc., Inc. v. Systems Technology Assocs., Inc., 557 F.2d 1280, 1287 (9th Cir.1977)). Second, "[i]f ... the defendant's activities are not so pervasive as to subject him to general jurisdiction, ... jurisdiction ... turns on an evaluation of the nature and quality of the defendant's contacts in relation to the cause of action." Id. We conclude that both tests are met as to Wakefield Industries in New York.
 
 
 19
 From its incorporation in Connecticut Wakefield Industries has been dependent on its New York parent Capehart Corporation for business and decision-making. Wakefield Industries' Norwich, Connecticut plant manufactured stereo systems for Capehart under the Capehart name; its president maintained his offices in Capehart's New York headquarters, and also acted as Capehart's president. In 1978 Capehart took direct control of Wakefield Industries' operations, and any pretense of independence was eliminated.[3] Among the responsibilities assumed by Capehart were the operation of Wakefield Industries' manufacturing plant and the reporting and contributing duties to the Pension Fund. Capehart regularly made these reports and payments for the next two years from its New York offices.[4] When the payments ceased in early 1980 the Pension Fund brought this suit.
 
 
 20
 While the relationship of parent and subsidiary alone would not suffice, Cannon Manufacturing Co. v. Cudahy Packing Co., 267 U.S. 333, 336-37, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925); School District of Philadelphia v. Kurtz Brothers, 240 F.Supp. 361, 364 (E.D.Pa.1965), where the two corporations are not really separate entities service on the parent will reach a foreign subsidiary. See Products Promotions, Inc. v. Cousteau, 495 F.2d 483, 492-93 (5th Cir.1974); Allan v. Brown & Root, Inc., 491 F.Supp. 398, 403 (S.D.Tex.1980); Edwards v. Gulf Mississippi Marine Corp., 449 F.Supp. 1363, 1365-66 (S.D.Tex.1978); Luria Steel & Trading Corp. v. Ogden Corp., 327 F.Supp. 1345, 1347-48 (E.D.Pa.1971); 3 Cyclopedia of Federal Procedure Acquiring Jurisdiction of the Person Sec. 11.79 (3rd ed. 1967 & Supp.1982). It is apparent on the record of this case that after 1978, and perhaps before that, Wakefield Industries was an indistinguishable part of its larger parent. Capehart accepted responsibility for meeting Wakefield Industries' obligations and for managing its assets. We have little trouble deciding that a corporation which was managed out of the home office of its parent, indeed, whose chief corporate officer keeps his office there,[5] is subject to the general jurisdiction of that state's courts. Cf. Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952) (foreign corporation doing general business through its president in Ohio subject to in personam jurisdiction in that state's courts); Orefice v. Laurelview Convalescent Center, Inc., 66 F.R.D. 136, 139-41 (E.D.Pa.1975) (foreign corporation whose agent is performing managerial duties in Pennsylvania amenable to in personam jurisdiction there).
 
 
 21
 Even if these corporate activities were insufficient to support general jurisdiction within the State of New York, the fact that Wakefield Industries' obligations to the Pension Fund were fulfilled in that state for almost 2 years makes the exercise of jurisdiction appropriate under the second prong of the Varsic test, 607 F.2d at 249. By making payments and reports to the Pension Fund in the State of New York, Capehart and its subsidiary Wakefield Industries availed itself of the privileges of that forum, and it is the cessation of these activities which gave rise to the present cause of action. Varsic, 607 F.2d at 249-50 (9th Cir.1979); Data Disc., Inc. v. Systems Technology Assocs., Inc., 557 F.2d 1280, 1287-88 (9th Cir.1977). The defendant Wakefield Industries may not now assert any unfairness in having to defend its activities in the same forum.[6] Id.
 
 II.
 
 22
 The second issue raised in this appeal is whether Wakefield Industries' president, Marvin Margolis, a nonparty, was properly served under Section 1132(e)(2) in a civil contempt proceeding for noncompliance with the district court's order enjoining the defendant, "along with its officers, agents, successors, and assigns from failing or refusing promptly to submit ... reports and contributions to the [Pension Fund]." The district court vacated its contempt order after deciding that Margolis had been served with the contempt motion outside the court's territorial limits under Federal Rule of Civil Procedure 4(f) and that Section 1132(e)(2) only authorized extraterritorial service to extend to defendants. We find that Section 1132(e)(2) does permit service of process on nonparties in contempt proceedings to enforce injunctions issued under ERISA, but hold that Margolis was nevertheless inadequately served with notice of the contempt motion in this case.[7]
 
 
 23
 Plaintiffs claim that Margolis can properly be found in contempt because he is an officer of defendant corporation who has actual notice of the injunction. Federal Rule of Civil Procedure 65(d) provides:
 
 
 24
 Every order granting an injunction and every restraining order ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise....
 
 
 25
 Fed.R.Civ.P. 65(d) (emphasis added). It appears that plaintiffs could probably demonstrate that Margolis is president of the corporation, with actual notice of the injunction, and that he failed to act as president to cause the corporation to comply with its terms.[8]
 
 
 26
 Whatever the outcome might be on the merits, the contempt proceeding must be predicated upon proper service on Margolis, who was not named a defendant in the action.
 
 
 27
 The only advance notice given Margolis of the contempt proceeding was the Motion to Cite for Contempt. A copy was mailed to him in New York. The district court seems to have assumed that this mailing would constitute otherwise sufficient service on Margolis, but decided that service in New York was not a proper predicate for the finding of contempt because the authorization in Section 1132(e)(2) of service in another district did not extend to nonparties.
 
 
 28
 We think the district court erred in its conclusion that Section 1132(e)(2) did not authorize extraterritorial service on a nonparty allegedly in contempt of an injunction under ERISA. We think, however, that the court could not acquire jurisdiction over Margolis to punish him for contempt without service of the type initially required to obtain jurisdiction over a party. Although service of the contempt motion by mail may well be sufficient when made on a party, Securities Exch. Com'n v. VTR, Inc., 410 F.Supp. 1309, 1313 (D.D.C.1975), we do not deem it sufficient for one who has not been brought in as a party.
 
 
 29
 ERISA's legislative history indicates Congress' intent that Section 1132(e)(2) extend to reach those in privity with the defendant. The Committee on Education and Labor of the House of Representatives, reporting on a draft of the ERISA legislation, stated that "[its] enforcement provisions have been designed specifically to provide ... participants and beneficiaries with broad remedies for redressing or preventing violations of the Act.... For actions in federal courts, nationwide service of process is provided in order to remove a possible procedural obstacle to having all proper parties before the court." H.R.Rep. No. 93-533, 93rd Cong., 1st Sess. 17 (1973), reprinted in [1974] U.S.Code Cong. & Ad.News, pp. 4629, 4655 (emphasis added).
 
 
 30
 Reading Section 1132(e)(2) so narrowly as to preclude the extraterritorial service of any person save the formally named defendant would thwart Congress' intent to reach all parties. This is particularly manifest when a corporation is the named defendant and the plaintiff seeks to enforce compliance by those asserted to be in privity with it. The appellee suggests that if enforcement is sought against others they should be named as defendants as well. In the case of a corporation, with many officers and corporate agents likely to play some role in following or ignoring an injunction, this is an ill-conceived solution. It seems much more likely that Congress intended that Section 1132(e)(2) should allow service not only upon the defendant but also those in privity with it wherever they are found.
 
 
 31
 While we are satisfied that Section 1132(e)(2) authorizes service of a contempt motion upon those allegedly in privity with the named defendant and subject to the court's injunction, the question remains as to the form of service required.
 
 
 32
 The proper manner for serving a nonparty with papers initiating a civil contempt proceeding has remained surprisingly ill defined. A starting point for determining the mode of service of civil contempt papers is Federal Rule of Civil Procedure 5. 15A Cyclopedia of Federal Procedures Sec. 87.84 (3rd ed. 1976). This rule permits pleadings filed subsequent to the summons and complaint to be served upon the counsel of record for each party, or upon the party himself where not represented by counsel. In either case Rule 5 authorizes service to be made by mail. Fed.R.Civ.P. 5(b).
 
 
 33
 The portion of Rule 5(b) allowing the service of post-complaint pleadings upon the counsel of record or upon the party through the mails departs from a preliminary draft of the rule that expressly required orders to show cause why a civil contempt order should not issue to be served upon "the party personally." 2 J. Moore & J. Lucas, Moore's Federal Practice p 5.06 & n. 3 (2d ed. 1982). As a matter of practice, however, contempt papers are generally served upon the party himself by order of the court. Id.; Fed.R.Civ.P. 5(b) (allowing direct service on party in court's discretion). While this personal service of the show cause order seems the better practice, Rule 5(b) nevertheless appears satisfied when the order is mailed to the party's attorney or directly to the party.
 
 
 34
 Whatever the proper mode of service of the show cause order upon parties to the litigation, the provisions of Rule 5 presuppose that the court has already attained jurisdiction over the individual served. 2 J. Moore & J. Lucas, supra, at p 5.04. The Rule's application to a nonparty for whom the court seeks to exercise jurisdiction for the first time in contempt proceedings is unclear.
 
 
 35
 The ambiguity created in applying the express provisions of Rule 5 to contempt proceedings generally, and to contempt proceedings against nonparties in particular, has been addressed by a number of local district court rules. See 7 Fed.Proc.L.Ed. Sec. 17:32 & n. 55 (1982). These local rules permit service of the notice or order upon counsel if the alleged contemnor has appeared in the action by attorney; "otherwise, service must be made personally in the same manner as service of a summons." Id.
 
 
 36
 The requirement of personal service, at least upon one who has not been made a party, seems to be a sound requirement of good practice.
 
 
 37
 We are aware of decisions which hold or suggest that personal service is not essential as long as it can be found that the nonparty in fact received sufficient notice of the proceeding to comply with due process.
 
 
 38
 In Consolidation Coal Co. v. Local U. No. 1784, U.M.W., 514 F.2d 763, 766 (6th Cir.1975), the court, although holding there was a lack of service in any form, and thus a violation of due process, said: "We do not imply, however, that, with a costly and illegal work stoppage in process, the strikers must be personally served; the 'unhurried deliberateness' of personal service may well further delay compliance with a no-strike injunction." Cf. Skinner v. White, 505 F.2d 685, 690 (5th Cir.1974).
 
 
 39
 In a District of Columbia case, Judge Gasch found service by mail on a nonparty corporate president adequate because of the president's actual notice of the proceeding and his very active participation in the conduct of the action. Securities & Exch. Com'n v. VTR, Inc., 410 F.Supp. 1309, 1314 (D.D.C.1975). Margolis' actual knowledge of the contempt proceeding before adjudication is much less clear.
 
 
 40
 The District of Columbia has no rule prescribing the manner of service in initiating a contempt proceeding. There was no order in this action authorizing service by mail, and there were no exceptional circumstances making personal service cumbersome. At least in the absence of a rule or order permitting service by mail or exceptional circumstances, we conclude that personal service was required.
 
 
 41
 We therefore affirm the order appealed from, vacating the adjudication of contempt. Further contempt proceedings may take place if personal service is effected or waived.
 
 
 42
 Affirmed.
 
 WILKEY, Circuit Judge, concurring:
 
 43
 I concur in Part II of Judge Fairchild's opinion and in the result.
 
 
 44
 ROBB, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 45
 I concur in Part I of Judge Fairchild's opinion, which holds that Wakefield Industries was properly served and that the District Court thus had jurisdiction to issue the injunction allegedly violated by Margolis. I do not agree with Part II of the opinion, which holds that service of the contempt motion on Margolis by mail was ineffective.
 
 
 46
 I would follow the rule established in SEC v. VTR, Inc., 410 F.Supp. 1309 (D.D.C.1975). In that case, Judge Gasch approved service by mail of a contempt motion on a nonparty president of a corporate defendant where the corporate officer had actual notice of the contempt proceeding. I think the VTR case cannot be distinguished on the ground that Margolis' actual knowledge of the contempt proceeding is less clear than that of the corporate president in the VTR case. Margolis does not deny that he received actual notice of the contempt proceeding against him, and thus has not rebutted the presumption that a letter deposited in the mails reaches the addressee, see Fed.R.Civ.P. 5(b). Nor can the VTR decision be distinguished on the ground that the president of VTR, Inc. had actively participated in defense of the suit against his corporation. Distinguishing the VTR case on this ground rewards Margolis for his disregard of the District Court's processes.
 
 
 47
 Rule 5(b) of the Federal Rules of Civil Procedure also supports a rule permitting service by mail under the circumstances presented here. Rule 5(b) authorizes service by mail on the attorney of a party. As the majority notes (ante at 1261-1262), this rule permits service of contempt motions by mail. An apparent rationale for permitting such service is that it saves needless expense and inconvenience: when a party has appeared by attorney, there is ample reason to presume that the party will receive documents mailed to his lawyer. This policy applies with equal force here. Although Margolis had not appeared personally in the action, his presence at the New York address had been verified by serving him there on two prior occasions, the latter of which came only some two weeks before the contempt motion was mailed. There was thus no reason to believe that mailing the contempt motion to this address would be inadequate to notify him of the contempt proceeding.
 
 
 48
 NLRB v. Hopwood Retinning Co., 104 F.2d 302 (2d Cir.1939) (per Clark, J., with L. Hand and A. Hand, JJ.), indicates that the policies of Rule 5 support mailing a contempt motion to a nonparty officer of a corporate defendant. In the Hopwood Retinning case, the NLRB sought to have two commonly-controlled corporations and certain corporate officers held in contempt for failure to comply with an earlier decision of the Court of Appeals. In the earlier decision, the Second Circuit had ordered the corporations to reinstate certain employees and to give them back pay. The corporate officers were not parties in the earlier action, but were apparently named as respondents in the contempt proceeding. Service of process in the contempt proceeding was mailed under Rule 5(b) to the attorneys who appeared on behalf of the two corporations in the earlier action; process was not served personally on the corporate officers. The Court of Appeals held service by mail sufficient to subject the corporate officers to a contempt order:
 
 
 49
 As a proceeding for civil contempt, this is therefore properly a continuance of the earlier action in this court and is a step in the enforcement of our previous judgment. Hence it was correctly instituted by motion served upon the counsel appearing for the parties in the record.
 
 
 50
 Id. at 305. The Hopwood Retinning case is factually different from the present case in that notice was mailed to Margolis rather than to counsel appearing on behalf of his corporation. This difference, however, is not significant. In both cases, a contempt proceeding was initiated against a nonparty officer of a corporate defendant, without personal service on the officer.
 
 
 51
 Neither Rule 4 nor Rule 5 of the Federal Rules of Civil Procedure requires that a contempt motion be personally served on a nonparty officer of a corporate defendant. Neither does due process require personal service, since service by mail on the facts here was "reasonably certain to inform" Margolis of the contempt proceeding, Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 315, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), and since Margolis had actual notice of the proceeding, Restatement (Second), Judgments, Sec. 2(1)(b) (1977). Thus, the only reason advanced by the majority for requiring personal service is that it "seems to be a sound requirement of good practice." Ante at 1261. In my view, good practice does not require personal service of a contempt motion in the circumstances presented here. The complaint and default order were personally served on Margolis as president, and, as the majority suggests (ante at 1261), he was bound by the District Court's injunction under Fed.R.Civ.P. 65. Service by mail to the New York address was highly likely to reach Margolis, and we should presume from the fact of mailing that notice in fact did reach him. Under these circumstances, I fail to see how service by mail has resulted in any unfairness to Margolis, or how personal service would have been a more sound practice.
 
 
 52
 I would hold that mailing a contempt motion to a nonparty officer of a corporate defendant is sufficient where the officer has actual knowledge of the action from which the contempt motion arises and actual notice of the contempt proceeding.
 
 
 
 *
 Of the United States Court of Appeals for the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 In addition to the cases cited in Varsic, the evolution in the meaning of "found" was noted in American Football League v. National Football League, 27 F.R.D. 264, 267-68 (D.Md.1961)
 
 
 [2]
 While this construction of the service of process provision of Section 1132(e)(2) requires us to decide whether jurisdiction would hypothetically lie in a district other than where suit has been brought, the interpretation has at least two merits. First, the test is not unrelated to an inquiry as to whether or not the defendant has received sufficient notice to satisfy due process. Where the evidence establishes enough defendant contacts with the forum state to satisfy the International Shoe standard, it is reasonably certain that actual notice will result from service of process in that state. International Shoe, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). Second, the "minimum contacts" test has the merit of offering some actual limit to the unrestricted service of a defendant corporation anywhere in the world. If the limit were only the due process requirement of likely notice, service could arguably be made on an officer, or lesser corporate agent, wherever such person may happen to be traveling. Cf. Fed.R.Civ.P. 4(d)(1)
 
 
 [3]
 Wakefield Industries' president candidly states that "[a]ll of its functions had been carried on directly by Capehart after January 1, 1978." Affidavit of Marvin Margolis, Joint Appendix at 45a
 
 
 [4]
 Payments to the Pension Fund were interrupted in January and the first half of February 1979 as Capehart experienced financial difficulty. Following a petition for reorganization under Chapter 11 of the Bankruptcy Act, Capehart continued to make regular payments and reports for almost another year. At that time Capehart sold the Connecticut manufacturing plant to Wakefield Industries, Inc., a Delaware Corporation (Wakefield-Delaware). Asserting that all plant employees were now Wakefield-Delaware employees, Capehart ceased additional payments to the Pension Fund. Margolis states in his affidavit that Capehart itself ceased operations at this time, some five months before service of summons in this action. We note, however, that Capehart had continued to make payments on behalf of Wakefield Industries until the sale and that it continued thereafter to maintain corporate offices in New York throughout this litigation
 
 
 [5]
 While not determinative, "the character and power of the one served as an agent of the corporation [is a] test of the right to acquire jurisdiction." Riverside Mills v. Menefee, 237 U.S. 189, 195, 35 S.Ct. 579, 581, 59 L.Ed. 910 (1915). Margolis was Wakefield Industries' president, and played a key role in the operation of that corporation and in the fulfilling of the corporation's obligations to the Pension Fund. That he kept his office in Capehart's New York office is a good indication that Wakefield Industries is "found" there
 
 
 [6]
 The appellee Margolis has asserted that the real defendant in the action below should have been Capehart Corporation, and that the Pension Fund simply erred in trying to serve a subsidiary corporation which had carried on no manufacturing--apparently its principal operation--for nearly two and a half years. The question of Capehart's--or for that matter Wakefield-Delaware's, see note 4 supra --liability for the obligations of Wakefield Industries is not before us on this appeal; the only issue is whether Wakefield Industries can be "found" at the home of its parent for service of process under Section 1132(e)(2). While it may be an accurate depiction of the facts to say that Wakefield Industries has been an inactive corporation for some time prior to service, the corporation was never dissolved; its president and its parent have been present and carrying on its business in the State of New York. In addition to fulfilling its obligations to the Pension Fund during this period, on at least one occasion Margolis acted for Wakefield Industries in signing a contract redefining the corporation's relations with the Pension Fund. It is no abuse of process to serve the corporate president and call upon the corporation to respond to allegations concerning these activities
 Having determined that Wakefield Industries was "found" in the State of New York, there is no question that service of process upon its president was valid under Fed.R.Civ.P. 4(d)(3), which allows service upon a domestic or foreign corporation "by delivering a copy of the summons and of the complaint to an officer." See, e.g., Spearing v. Manhattan Oil Transportation Corporation, 375 F.Supp. 764, 771 (S.D.N.Y.1974); Orefice v. Laurelview Convalescent Center, Inc., 66 F.R.D. 136, 142 (E.D.Pa.1975).
 
 
 [7]
 The appellee's additional claim that plaintiff's motion to cite for contempt was void under Fed.R.Civ.P. 5(a) for raising "a new and additional claim for relief" against Margolis is without merit. The motion only seeks sanctions against Margolis for failing to take steps to comply with the injunction issued against the corporation in his official capacity as president. Cf. Wilson v. United States, 221 U.S. 361, 376, 31 S.Ct. 538, 542, 55 L.Ed. 771 (1911); NLRB v. Sequoia District Council of Carpenters, 568 F.2d 628, 634 (9th Cir.1977); 15A Cyclopedia of Federal Procedure Particular Actions and Proceedings Sec. 87.81 (3rd ed. 1976). Any assertion that this motion seeks a new and personal claim against Margolis for debts incurred by the corporation has no basis
 
 
 [8]
 Rule 65(d) codifies the common law rule that "to be held liable in contempt, it is necessary that a non-party respondent ... 'either abet the defendant, or ... be legally identified with him.' " Backo v. Local 281, United Brotherhood of Carpenters and Joiners, 438 F.2d 176, 180-81 (2d Cir.1970), cert. denied, 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 99 (1971) (quoting Alemite Manufacturing Corporation v. Staff, 42 F.2d 832, 833 (2d Cir.1930)). In general a corporate officer is "legally identified with [the corporation], and thus liable in contempt for disobeying an order directed to [it]." NLRB v. Sequoia District Council of Carpenters, 568 F.2d 628, 633 (9th Cir.1977)